Joshua N. Eppich (TBN 24050567)
Ken Green (TBN 24050698)
Eric T. Haitz (TBN 24101851)
**BONDS ELLIS EPPICH SCHAFER JONES LLP**
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 529-2732 telephone
(817) 405-6902 facsimile
Email:  joshua@bondsellis.com
Email : ken.green@bondsellis.com
Email: eric.haitz@bondsellis.com

*Proposed Counsel for*
*Debtors and Debtors-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| IN RE:<br><br>BALKAN EXPRESS, LLC, *et al.*<br><br>Debtors.[1] | § Chapter 11<br>§<br>§ Case No. 25-41544<br>§<br>§ (Joint Administration Requested)<br>§<br>§ |

**DECLARATION OF DANIEL IVANDIC IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF**

I, Daniel Ivandic, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Controller at Balkan Express, LLC ("Express") and Balkan Logistics, LLC ("Logistics" and together with Express, the "Debtors"). In my capacity as Controller, I manage the Debtors accounting and payment systems, direct the handling of or handle directly the payment

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Balkan Express, LLC (3974), and Balkan Logistics, LLC (8202). The Debtors' mailing address is 2560 E Long Ave, Fort Worth, Texas 76137.

of payroll, interact with vendors and contract counterparties, and handle other ordinary corporate operations of the Debtors.

2. On April 30, 2025 (the "Petition Date"), the Debtors filed a voluntary petition for relief (the "Petition") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas (the "Court").

3. I submit this declaration (this "First Day Declaration"), pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) to provide an overview of the Debtors' business and these chapter 11 cases (the "Chapter 11 Cases"), and (b) to support the Debtors' emergency applications and motions for "first day" relief (collectively, the "First Day Motions").

4. Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.

5. To the extent that any information provided herein is materially inaccurate, I will act promptly to notify the Court and other parties; however, I believe all information herein to be true to the best of my knowledge. I am authorized to submit this First Day Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

6. In addition to providing the factual support for the First Day Motions, the primary purpose of this First Day Declaration is to familiarize the Court with the Debtors and the Chapter 11 Cases.

7. This First Day Declaration is organized as follows: <u>Part I</u> provides a general overview of the Debtors' business, corporate structures, and a description of the events leading up to this Chapter 11 Case; <u>Part II</u> describes the Debtors' capital structures; and <u>Part III</u> sets forth my basis for testifying to the facts underlying and described in each of the First Day Motions.

8. The Debtors' continue to operate their business and manage their property as debtors in possession. No request for the appointment of a trustee or examiner has been made in this Chapter 11 Case, and no committees have been appointed or designated.

9. Concurrently herewith, the Debtors and its affiliates have filed a motion seeking joint administration of the Debtors' Chapter 11 Cases.

## PART I: OVERVIEW OF THE DEBTORS[2]

***A.   The Debtors' Business & Events Leading up to the Chapter 11 Cases***

10. For more than sixteen years, the Debtors has historically provided ground transport services, trucking services, logistics services across all 48 continental states nationwide. The Debtors services include freight transportation, supply chain solutions, warehousing and distribution services capable of locating trucks and cargo 24 hours a day, seven days a week. Although the Debtors are capable of operating, and have historically operated, nationwide, more recently, the Debtors core business offerings have focused on trucking, ground transport, and logistics services in the Western half of the United States with its principal base of operations being Fort Worth, Texas.

---

[2] Capitalized terms used in this Introduction but not defined shall have the meaning ascribed thereto in the remainder of this First Day Declaration.

11. The Debtors have suffered several challenges in the months and years immediately preceding the Petition Date. First, the entire freight, cargo, and trucking industries have seen a significant decline over the last several years. Several longstanding American trucking companies have sought protection under the Bankruptcy Code, and some even liquidated without any effort to reorganize. The troubles in the trucking and freight industries stem partly from a saturated trucking services provider market.

12. Additionally, more recently, decreased daily rate prices (i.e., the prices paid for transportation and trucking services) have declined considerably as a result of slowdowns attributable to decreased trade stemming from newly-announced tariff policies implemented by the current federal administration.

13. Furthermore, at the same time that the market for the Debtors' services weakened, the Debtors' leverage position became challenging to manage. With decreased daily rate prices, debt service became more difficult to satisfy. As a result, the Debtors got behind on many of their Vehicle Loans—prompting the Debtors to resort to alternative sources of liquidity, discussed below.

14. The Debtors commenced the Chapter 11 Cases to consummate one or more value-maximizing transactions with respect to the sale of a portion of the Debtors' assets for the benefit of the Debtors' creditors. Furthermore, through these Chapter 11 Cases, the Debtors intend to shrink their asset base through the sale of trucks and trailers, payoff corresponding secured debt held by institutional and alternative lenders, and emerge from chapter 11 as a de-levered, more nimble operating trucking and logistics company.

*B.  The Debtors Corporate Organization*

15. The Debtors are each single-member limited liability companies organized under the laws of the State of Texas. Express manages the corporate operations of the Debtors business, and Logistics serves principally as the employer of approximately 150 truck drivers with limited other operations.

## PART II: THE DEBTORS' CAPITAL STRUCTURE

16. As of the Petition Date, the Debtors have (a) a negative cash position, (b) approximately $22.3 million in total principal outstanding under its approximately 43 funded traditional secured vehicle loan facilities, (c) approximately $3.9 million in receivables factored pursuant to its factoring agreement with Compass, (d) approximately $669,000 in additional loans with Compass, and (e) approximately $665,000 in total outstanding unsecured debt obligations, of which, approximately $100,000 is attributable to fuel charges from Pilot that the Debtors seek immediate authorization to pay.

*A.  Secured Vehicle Loans—Traditional Vehicle Lenders*

17. To fund the Debtors acquisition of additional trucking fleet inventory, in the ordinary course, the Debtors obtain secured vehicle loans to finance the purchase of new trucks and trailers (the "<u>Vehicle Loans</u>"). The Vehicle Loans are comprised of approximately 43 separate loans originated by approximately sixteen separate financial institutes (the "<u>Vehicle Lenders</u>") with an aggregate amount outstanding of approximately $22.3 million as of the Petition Date. The Vehicle Lenders include:

   a. BMO

   b. Daimler Financing

   c. De Lage Laden Financial

  d. Huntington Bank

  e. Hyundai Translead Trailer Finance

  f. M&T Capital

  g. MHC Financial Services

  h. Mitsubishi HC Capital America

  i. Navistar Financial Corporation

  j. PNC Bank

  k. Sumitomo Mitsui Finance

  l. Triumph

  m. Truist Bank

  n. Wallwork Financial Corporation

  o. Wells Fargo

  p. Volvo

18. Each of the loans comprising the Vehicle Loans are secured by first lien security interests in certain of the Debtors' assets, including trucks and trailers.

## B. *The Debtors' Factoring Arrangement and Alternative Financing*

  i. <u>The Compass Factoring Arrangement</u>

1. To fund the Debtors' operations and assure sufficient working capital, the Debtors entered into a Factoring and Security Agreement dated July 16, 2020 (the "<u>Factoring Agreement</u>") with Compass Funding Solutions LLC ("<u>Compass</u>") whereby Express would sell acceptable accounts receivable to Compass in accordance with the terms set forth in the Factoring Agreement. Prior to the Petition Date, the Debtors sold to Compass acceptable accounts receivable generated from the Debtors' business operations and advance payments were made by Compass to the

Debtors. All of the Debtors obligations under the Factoring Agreement are subject to a lien attaching to substantially all of the Debtors' assets. As of the filing the Petition Date, the Debtors had approximately $3.9 million in accounts receivable factored with Compass.

    ii.    <u>The Compass Vehicle Loan</u>

19. In addition to the amounts factored pursuant to the Factoring Agreement, the Debtors entered into a vehicle financing addendum with Compass (the "<u>Vehicle Addendum</u>"). Pursuant to the Vehicle Addendum, Compass loaned approximately $850,000 to Express in January 2025 (the "<u>Compass Vehicle Loan</u>"). The Compass Vehicle Loan was entered into as an addendum to the Factoring Agreement and constitutes an obligation owing by the Debtors under the Factoring Agreement. As additional security for the Compass Vehicle Loan, the Debtors also pledged certain otherwise unencumbered trucks and trailers as collateral securing amounts outstanding under the Compass Vehicle Loan. As of the Petition Date, the Debtors owed approximately $389,000 on account of the Compass Vehicle Loan.

    iii.    <u>The Compass Advance Loan</u>

20. In addition to the amounts factored pursuant to the Factoring Agreement, the Debtors entered into an advance financing addendum with Compass (the "<u>Advance Addendum</u>"). Pursuant to the Advance Addendum, Compass loaned approximately $374,000 to Express in March 2025 (the "<u>Compass Advance Loan</u>"). The Compass Advance Loan was entered into as an addendum to the Factoring Agreement and constitutes an obligation owing by the Debtors under the Factoring Agreement. The Compass Vehicle Loan is As of the Petition Date, the Debtors owed approximately $280,000 on account of the Compass Vehicle Loan.

C.    *Debtors' Unsecured Obligations*

21.    As of the Petition Date, the Debtors are substantially current on payment of trade claims and other unsecured liabilities. As of the petition date, the Debtors estimate that approximate $665,000 is owed to creditors on account of unsecured obligations.

D.    *The Debtors' Equity*

22.    The Debtors are each member-managed LLCs organized under the laws of the State of Texas. The sole member of each of the Debtors is Zlatan Karic.

## PART III: SUPPORT FOR FIRST DAY RELIEF

23.    Following the filing of the Debtors' chapter 11 petitions, the Debtors filed certain First Day Motions seeking relief that the Debtors believe is necessary to enable it to operate in the Chapter 11 Cases with minimal disruption and loss of value to the Debtors' estates. Such relief is critical to stabilizing and facilitating the Debtors' operations during the pendency of the Chapter 11 Cases.

24.    I have reviewed each of the First Day Motions. All of the facts set forth in the First Day Motions are true and correct to the best of my knowledge and belief based upon (a) my personal knowledge of the Debtors' operations and finances, (b) information learned from my review of relevant documents, (c) information supplied to me by other members of the Debtors' management team and the Debtors' advisors, and/or (d) my opinion based upon my knowledge and experience or information I have reviewed concerning the Debtors' operations and financial conditions.

A. **The Debtors' Emergency Motion for Entry of an Order (a) Directing the Joint Administration of the Debtors' Chapter 11 Cases and (b) Granting Related Relief** (the "<u>Joint Administration Motion</u>")

25. In the Joint Administration Motion, the Debtors' request entry of an order providing for the joint administration of the Chapter 11 Cases for procedural purposes only.

26. As discussed in greater detail below, the Debtors' business inextricably intertwined. By way of example, Logistics employs the drivers that drive the trucks owned by Express. The historical interrelationships between the Debtors warrant joint administration. For example, I serve as the Controller of both Debtors. Moreover, the equity structure of the Debtors is identical. Indeed, under the Bankruptcy Code, each is an affiliate of the other. Joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders that will arise in these Chapter 11 Cases will jointly affect all four debtors. The entry of an order directing joint administration of these Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the Office of the United States Trustee and all parties in interest to monitor these Chapter 11 Cases with greater ease and efficiency.

27. I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest. Accordingly, on behalf of the Debtor, I respectfully submit that the Joint Administration Motion should be approved.

B. **The Debtors' Emergency Motion for Entry of an Orders Authorizing (a) the Maintenance of the Cash Management System; (b) Maintenance of the Existing Bank Accounts; (c) Continued Use of Existing Business Forms; (d) Continued Use of Certain Fuel Cards; and (e) Granting Related Relief** (the "<u>Cash Management Motion</u>")

28. Like other medium-sized businesses, the Debtors have a compponplace its Cash Management System that efficiently collects, transfers, and disburses funds generated through the

Debtors' operations and accurately records such collections, transfers, and disbursements as they are made. The Debtors' financial personnel, including myself, manage the Cash Management System from the Debtors' office in Fort Worth, Texas.

29. The relief requested in the Cash Management Motion is vital to facilitating the Debtors' seamless transition into bankruptcy. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable Debtors' to continue to operate their business in the Chapter 11 Cases with minimal disruption, thereby benefiting all parties in interest. Accordingly, for the reasons set forth herein and in the Cash Management Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be granted.

C. ***The Debtors' Emergency Motion for Entry of an Order Authorizing Payment of (a) Certain Prepetition Wages, Salaries, and Other Compensation and (b) Certain Employee Benefits and Other Associated Obligations*** **(the "<u>Employee Wage Motion</u>")**

30. The Debtors' Employees are all critical to ensuring that the value of the Debtors' business is preserved during the case. The value and importance of the Debtors' Workforce cannot be overstated. The institutional knowledge, experience, and skills of the Employees and Independent Contractors are essential to the Debtors' ability to preserve and maximize the value of the Debtors' assets during the Chapter 11 Cases. The Workforce performs critical functions for the Debtors, including, among many other things, truck driving, maintenance, accounting, finance, administrative functions, and, during the Chapter 11 Cases, asset identification and relocation in connection with asset sales.

31. The relief requested in the Employee Wage Motion is necessary for the Debtors to be able continue to maintain the business, and preserve the value of the Debtors' estates as the Debtors seek to shrink their asset base, de-level their balance sheet, and emerge as a reorganized

operating company. If the Debtors cannot assure their Employees that the Debtors will promptly pay Employee Obligations (as defined in the Wages Motion), as applicable, to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, the Employee Plans and Programs (as defined in the Wages Motion), the Debtors believe that some Employees will likely seek employment elsewhere.

32. The loss of Employees at this critical juncture would have a material negative impact on the Debtors' ability to maximize value of the estate's assets. This is particularly true given that the Debtors have experienced a broader industry slowdown and truckers are acutely familiar with the consequences of a company converting a chapter 11 case to a case under chapter 7.

33. It is essential that the Debtors be authorized to continue honoring the Employee Obligations and Employee Plans and Programs (as defined in the Wages Motion). The relief requested in the Employee Wage Motion is necessary for the Debtors to be able to maintain morale, continue to maintain the business, and preserve creditor confidence in the Debtors' continued operations and preserve value of the Debtors estates during the Debtors' reorganization under chapter 11.

34. Accordingly, for the reasons set forth herein and expanded on in the Employee Wage Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Employee Wage Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in the Chapter 11 Cases with minimal disruption, thereby maximizing value for the estate.

D.  **The Debtors' Emergency Motion for Entry of an Order Authorizing Payment of Critical Fuel Provider Claim Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Granting Related Relief** (the "<u>Critical Vendor Motion</u>")

35. In the ordinary course of business, the Debtors maintain company-paid credit cards (the "<u>Fuel Cards</u>," and such program, the "<u>Fuel Card Program</u>"). The Fuel Cards are issued by EFS-Electronic Funds Source (the "<u>Fuel Card Servicer</u>") and are used for the purchase of fuel by the Debtors' employees and facilitate the tracking of which trucks are being fueled and mileage. The Fuel Card Servicer works with Pilot Travel Centers, LLC ("<u>Pilot</u>") who has provided the Debtors with a line of credit to accrue charges for fuel on the Fuel Cards. The Fuel Card statements are periodically reviewed and documented business expenses are paid by a weekly direct debit from the Debtors' operating account(s).

36. The Debtors' truck drivers charge fuel to the Fuel Cards during the ordinary course of the performance of their services. Historically, the Debtors have paid the Fuel Card balance on a weekly basis each Wednesday. For example, for a seven-day period from Monday to Sunday, the Debtors pay for such fuel charges on the first Wednesday following the Sunday at the end of such period. Such weekly payments pay down the line of credit supplied by Pilot. Accordingly, in the ordinary course, the Debtors incurred charges on the Fuel Card pursuant to the Fuel Card Program for the period of April 28, 2025 through the Petition Date the ("<u>Stub Period</u>"). The Critical Fuel Provider Claim reflects the amounts incurred for the payment of fuel during the Stub Period.

37. The use of credit cards and similar payment methods is widespread at companies across the United States. In particular, the use of the Fuel Cards is absolutely critical to the continued operations of the Debtors' trucking and logistics operations, and commonplace in the

Debtors' prepetition ordinary course operations and in operations of similarly situated companies in the Debtors' industry.

38. To continue operating the Debtors' businesses, the Debtors require the services of the Fuel Card Vendor, which is part and parcel with the streamlined services provided by Pilot. I believe that if the Debtors fail to pay the Critical Fuel Provider Claim (as defined in the Critical Vendor Motion), Pilot is likely to terminate the Fuel Card Program. I also believe that is not feasible to obtain a replacement servicer or provider for the Fuel Card Program because (a) it is not certain that any fuel provider will agree to provide agreeable terms to the Debtors, and (b) there would necessarily be a delay that would be devastatingly disruptive to the Debtors' operations. The consequences of such a cessation of the Fuel Card Program cannot be overstated.

39. Accordingly, for the reasons set forth herein and expanded on in the Critical Vendor Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Critical Vendor Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in the Chapter 11 Cases with minimal disruption, thereby maximizing value for the estate.

E. ***Debtors' Emergency Motion for Interim and Final Orders Authorizing the Debtors to (i) Maintain and Continue to Operate under Factoring and Security Agreement in Order to Sell Accounts Post-Petition to Compass Funding Solutions LLC Pursuant to 11 U.S.C. § 363(b), (c), (f), and (m); (ii) Obtain Working Capital from Compass Funding Solutions LLC Pursuant to 11 U.S.C. § 364(c)(1), (c)(2), & (d)(1); (iii) Grant Compass Funding Solutions LLC Adequate Protection in the Form of First Priority Liens and Security Interests on Property of the Debtor's Estate Pursuant to 11 U.S.C. §§ 361 and 363(e); (iv) Modify the Automatic Stay; and (v) Grant Such Other Related Relief***

1. To fund the Debtors' operations and assure sufficient working capital, Express entered into a the Factoring Agreement with Compass whereby Express would sell acceptable accounts receivable to Compass in accordance with the terms set forth in the Factoring Agreement, a copy of which is attached to the DIP Financing Motion.

2. Pursuant to the Factoring Agreement, Express sold to Compass acceptable accounts receivable generated from the Debtors' business operations. Compass purchased the acceptable accounts receivable at face value less the finance fee of one percent and one quarter of one percent (1.25%). Invoices with supporting documentation are submitted to Compass as they are generated with each invoice including instructions to the customer to make and mail payments to Compass at a lock box controlled by Compass. Advance payments are made by Compass to the Debtors. Receipts to the lock box are accounted for daily. Compass collects its advances, deducts its finance fee and remits any remaining funds to the Debtors.

3. A reserve amount is maintained by Compass in a Reserve Account established pursuant to the Factoring Agreement. As acceptable accounts receivable are purchased, the Reserve Account fluctuates based on the amount of purchased accounts. Likewise, the Reserve Account fluctuates as payments on purchased accounts are received and additional discounts or fees are earned by Compass.

4. As the Reserve Account establishes sufficient amounts of earned reserve, additional funds are released to the Debtors.

5. As part of the Factoring Agreement, Express covenants to repurchase purchased accounts Compass requires (the "Repurchase Obligation"). To secure the Repurchase Obligation and other obligations of Exspress under the Factoring Agreement, Express granted Compass a first lien security interest in Collateral, as that term is defined in the Factoring Agreement.

6. Compass duly perfected its first priority security interest in the Collateral, as defined in the Factoring Agreement, by filing a UCC-1 Financing Statement with the Texas Secretary of State's Office on July 14, 2020, under Filing No. 20-0035214411. A true and correct copy of the Financing Statement is attached to the DIP Financing Motion.

7. Compass and Express have operated under the Factoring Agreement up to and including the Petition Date.

8. Post-petition, Compass has agreed to continue to purchase the receivables of Express in the same manner it purchased receivables pre-petition, including requiring the same security and lien rights in the Debtors' assets that it maintained prepetition. To that end, the Debtors and Compass seek an order that allows the Factoring Agreement to continue post-petition and allows acceptable receivables be sold pursuant to Section 363(b) of the Bankruptcy Code.

9. As part of the agreement to continue to purchase receivables, Compass is requiring protections under Section 364(c) and (d) of the Bankruptcy Code to protect against any assertion of any other secured creditor in the Collateral. The Debtors are not currently aware of any secured creditor with an interest in the Collateral superior to the interest proposed to be granted to Compass.

10. The Debtors and Compass have agreed to maintain their existing Factoring Agreement as a post-petition agreement and wish to operate on a post-petition basis in accordance with the terms of the Factoring Agreement, and subject to and conditioned upon Bankruptcy Court approval.

11. To that end, the Debtors and Compass have agreed to enter into that certain *Post-Petition Chapter 11 Bankruptcy Rider to Factoring and Security Agreement* (the "Rider"). A copy of which is attached to the DIP Financing Motion.

12. By the DIP Financing Motion, the Debtors seeks authority to sell acceptable accounts receivable to Compass, modify the automatic stay so that Compass can continue to collect on purchased accounts and properly notify account debtors, and grant Compass post-petition liens to secure the Debtors' obligations under the Post-Petition Agreements as requested herein on an

interim basis. The Debtors further request that the Court set a final hearing on the Debtor's Motion at least fourteen (14) days after service of the Motion.

13. The Debtors cannot operate without factoring its receivables. The Debtors will be unable to generate sufficient cash flow to continue operations without the ability of Compass to acquire the Debtors' accounts receivable. Express has been using factoring to acquire working capital with Compass since as early as 2020 and does not otherwise maintain adequate cash flow to fund its operations on extended terms with its customer base. Absent the Debtors' ability to continue to sell its accounts receivable to Compass, the Debtor's operations would immediately cease.

14. Cause exists for the Court to grant the relief requested in the DIP Financing Motion. Without the ability of Compass to collect on factored accounts receivable and to apply the collected funds against the obligations of the Debtors, Compass will not continue to purchase accounts receivable from the Debtors, and the Debtors' ability to acquire working capital post-petition will be non-existent. The Debtors would have to cease operations and shut its doors to the detriment of its creditors and the estates.

40. Debtors' ability to continue their operations by receiving working capital from Compass in the form of advances from purchased accounts is necessary to avoid immediate and irreparable harm to the estates. The Debtors' ability to obtain debtor-in-possession factoring facilities from Compass will allow the Debtors to continue operating so that it can continue with this reorganization by proposing a plan to satisfy the claims of creditors. The Debtors have negotiated the best terms available to obtain the funding it needs to maintain sufficient liquidity to preserve its assets over the course of the Chapter 11 Cases. The Debtors submit that the circumstances of the Chapter 11 Cases require the Debtors to obtain financing under Section

364(c) and (d) of the Bankruptcy Code, as Compass requires such relief to provide the Post-Petition Agreements. Express has operated pursuant to the Factoring Agreement for years and is simply unable to obtain alternative financing from any other financing company or Compass at this juncture. Further, without continued access to factor its receivables under the Post-Petition Agreements, the Debtors will be forced to immediately cease operations, leaving no ability to pay its employees, service its customers, and ultimately repay its creditors.

41. Accordingly, for the reasons set forth herein and expanded on in the DIP Financing Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the DIP Financing Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in the Chapter 11 Cases with minimal disruption, thereby maximizing value for the estate.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: May 1, 2025                                    Respectfully submitted,

*/s/ Daniel Ivandic*
**Daniel Ivandic**
Controller
Balkan Express, LLC
Balkan Logistics, LLC