Joshua N. Eppich (TBN 24050567)
Ken Green (TBN 24050698)
Eric T. Haitz (TBN 24101851)
**BONDS ELLIS EPPICH SCHAFER JONES LLP**
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: joshua@bondsellis.com
Email: ken.green@bondsellis.com
Email: eric.haitz@bondsellis.com

*Proposed Counsel for*
*Debtors and Debtors-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| | § | **Case No. 25-41544** |
| **BALKAN EXPRESS, LLC,** *et al.* | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |
| | § | |
| | § | |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING THE DEBTORS TO (I) ENTER INTO THE TRUCK TERMINAL SALE AGREEMENT AND (II) ENTER INTO THE LEASE AGREEMENT AND CONSUMMATE THE LEASEBACK TRANSACTION; (B) APPROVING (I) THE STALKING HORSE BID PROTECTIONS, AND (II) THE OVERBID REQUIREMENTS; AND (C) GRANTING RELATED RELIEF

> **IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXNB.USCOURTS.GOV/ NO MORE THAN TWENTY-FOUR (24) DAYS AFTER THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK AND FILED ON THE DOCKET NO MORE THAN TWENTY-FOUR (24) DAYS AFTER THE DATE**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Balkan Express, LLC (3974), and Balkan Logistics, LLC (8202). The Debtors' mailing address is 2560 E Long Ave, Fort Worth, Texas 76137.

> **THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **A HEARING WILL BE CONDUCTED ON THIS MATTER ON JULY 10, 2025, AT 1:30 PM IN COURTROOM 204, U.S. COURTHOUSE, 501 W. TENTH STREET, FORT WORTH, TEXAS 76102.**
>
> **YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.**
>
> **AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 1.650.479.3207, MEETING ID: 2309 445 3213. VIDEO COMMUNICATION WILL BE BY USE OF THE CISCO WEBEX PLATFORM. CONNECT VIA THE CISCO WEBEX APPLICATION OR CLICK THE LINK ON JUDGE MORRIS'S HOME PAGE. THE MEETING CODE IS 2309-445-3213. CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**
>
> **HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF ELECTRONIC HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE MORRIS'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

Balkan Express, LLC ("Balkan") and Balkan Logistics, LLC ("Logistics" and together with Balkan, the "Debtors") hereby move the Court (this "Motion")[2] for entry of an order (the "Order"), substantially in the form attached hereto, pursuant to sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rules 2002-1 and 9014-1 of the Local Rules for the Northern District of Texas (the "Bankruptcy Local Rules"), (a) authorizing, but not directing, the Debtors to (i) enter into the Truck Terminal Sale Agreement and (ii) enter into the Lease Agreement and consummate the Leaseback Transaction; (b) approving (i) the Stalking Horse Bid Protections, and (ii) the Overbid Requirements; and (c) granting related relief.  In support of the Motion, the Debtors respectfully represent as follows:

---

[2]     Capitalized terms used but not defined in this introductory paragraph have the meaning ascribed to such terms elsewhere in this Motion.

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent pursuant to Bankruptcy Rule 7008 to the entry of a final order by the Court in connection with the Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The predicates for the relief requested herein are sections 105(a), 363, 1107(a), and 1108 of the Bankruptcy Code, Bankruptcy Rule 6004, and Bankruptcy Local Rule 9013-1.

## BACKGROUND

### A.      General Background

4.      On April 30, 2025 (the "Petition Date"), the Debtors commenced their Chapter 11 Cases by filing voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas (this "Court").

5.      The Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

6.      Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and manage their financial affairs as debtors in possession.

7.      No request for a trustee or examiner has been made in the Chapter 11 Cases, and no committees have been appointed or designated.

8.      The Debtors provide trucking, hauling, and logistics services principally in Texas and the Western region of the United States.  Information regarding the Debtors' history and business operations, capital structure and secured indebtedness, and the events leading up to the commencement of the Chapter 11 Cases can be found in the *Declaration of Daniel Ivandic in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* [Docket No. 15] (the "First Day Declaration").

**B.      The Truck Terminal**

9.      The Debtors operate their business from a central truck terminal and office space located at 2560 E Long Ave, Fort Worth, Texas 76137 (the "Truck Terminal").  The Truck Terminal serves as the corporate headquarters for the Debtors' operations, and also provides a service and operational hub for a portion of the Debtors' trucking fleet.

10.      Balkan has a fee simple ownership interest in the Truck Terminal, subject to a small number of secured claims.

**C.      The Truck Terminal Marketing and Solicitation Process and the Truck Terminal Sale Agreement**

11.      Prior to the Petition Date, and during the pendency of these Chapter 11 Cases, the Debtors have continued to evaluate the Debtors' operational and liquidity needs.  As part of the Debtors' ongoing evaluation, the Debtors, along with advice of their Broker (defined below) and their other advisors, determined that it was in the best interests of the Debtors and their estates to generate liquidity from the sale of the Truck Terminal.

12.      Accordingly, in March, the Debtors began exploring the sale of the Truck Terminal and solicited interests from numerous parties for a potential sale transaction.  Ultimately, the Debtors engaged the Broker (whose application to employ is forthcoming).  Subsequently, the

Debtors and Broker jointly marketed, solicited, and negotiated terms of multiple potential sale transactions with multiple interested parties.

13.    On June 3, 2025, Balkan entered into that certain *Amended and Restated Commercial Contract of Sale* (the "Truck Terminal Sale Agreement"), dated June 3, 2025, by and between CanTex RE Holdings, LLC (the "Stalking Horse Bidder") and Balkan.  A true and correct copy of the Truck Terminal Sale Agreement is attached hereto as **Exhibit A**.

14.    Pursuant to the Truck Terminal Sale Agreement, Balkan proposes to sell the Truck Terminal to the Stalking Horse Bidder for a purchase price of $4 million (the "Sale Transaction"). Additionally, pursuant to Paragraph 26.A of the Truck Terminal Sale Agreement, Balkan and the Stalking Horse Bidder agree to execute a lease agreement for the lease of the Truck Terminal upon the terms specified therein (the "Leaseback Transaction").  *See* Ex. A at ¶ 26.A.

**D.    *The Proposed Stalking Horse Protections***

15.    As an incentive for the Stalking Horse Bidder to enter into the Truck Terminal Sale Agreement upon the terms set forth therein, the Debtors offered to provide certain stalking horse protections to the Stalking Horse Bidder.  Specifically, the Debtors offered to provide a break-up fee in the amount of 5% of the purchase price (the "Stalking Horse Bid Protections").  The Stalking Horse Bid Protections do not provide for any expense reimbursement.

**E.    *The Proposed Overbid Requirements***

16.    To permit the Debtors to solicit higher or otherwise better offers for the sale of the Truck Terminal, the Debtors propose that any overbid ("Overbid") from any interested party (such party a "Potential Bidder") proposing to purchase the Truck Terminal shall comply with the following overbid requirements (collectively, the "Overbid Requirements"):

a.  <u>Timing</u>.  Each Overbid must be submitted no later than July 18, 2025.

b.  <u>Purchase Price</u>. Each Overbid must clearly identify the purchase price to be paid and specify the aggregate amount of cash and other consideration being offered.

c.  <u>Deposit</u>:  Each Overbid must include delivery of a cash deposit to the client trust account of Debtors' counsel in an amount equal to the Stalking Horse Protections *plus* 15% of the Potential Bidder's proposed purchase price.

d.  <u>Unconditional Offer / Contingencies</u>. A statement that the Overbid is formal, binding, and unconditional, is not subject to any further due diligence or financing contingency, and is irrevocable until the Debtors notify the Potential Bidder that such Bid is not a Successful Bid or a Back-Up Bid, or until the first business day after the closing of the Sale Transaction.

e.  <u>Proof of Financial Ability to Perform</u>. Each Overbid must contain such financial and other information that allows the Debtors to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Sale Transaction including, without limitation, ability to post replacement letters of credit, as applicable. Without limiting the foregoing, such information must include current financial statements or similar financial information certified to be true and correct as of the date thereof, proof of financing commitments if needed to consummate the transaction (not subject to, in the Debtors' reasonable business judgment, any unreasonable conditions), contact information for verification of such information, including any financing sources, and any other information reasonably requested by the Debtors.

f.  <u>Required Approvals</u>. Each Overbid must contain a statement or evidence (i) that the Potential Bidder has not conditioned its Overbid on (a) obtaining financing, (b) any internal approval, (c) the outcome or review of unperformed due diligence, or (d) regulatory contingencies.

g.  <u>Representations and Warranties</u>. Each Overbid must include the following representations and warranties.

   ▪  a statement that the Potential Bidder has had an opportunity to conduct, and has completed, any and all due diligence regarding the applicable business or asset prior to submitting its Overbid;

   ▪  a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the businesses or assets in making its Bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by

operation of law or otherwise, regarding the businesses or assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Potential Bidder's Overbid ultimately accepted and executed by the Debtors;

- a statement that the Potential Bidder has not (i) engaged in any collusion with respect to the submission of any Overbid, (ii) coordinated or joined with any other party on a bid or Overbid, or (iii) taken any other action to prevent a transparent and competitive auction process; and

- a statement that all proof of financial ability to consummate the proposed transaction in a timely manner and all information provided to support the Overbid is true and correct.

17.    The Debtors will evaluate Overbids that are timely submitted and may engage in negotiations with Potential Bidders who submitted Overbids as the Debtors deem appropriate in the exercise of their reasonable business judgment, based upon the Debtors' evaluation of the content of each Overbid.  The Debtors may, in the exercise of their business judgment, determine whether any Overbid constitutes the highest or otherwise best offer for the Truck Terminal (such proposal, an "Alternate Transaction"); *provided*, for the avoidance of doubt, such exercise of the Debtors' business judgment shall include, without limitation, consideration of the benefits of the Leaseback Transaction and whether any Overbid includes commensurate benefits.

## RELIEF REQUESTED

### A.    *Reasonable Exercise of the Debtors' Sound Business Judgment and in the Best Interests of Estates*

18.    The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Fifth Circuit have granted a debtor's request to sell property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g., In re BNP*

*Petroleum Corp.*, 642 F. App'x 429, 435 (5th Cir. 2016); *In re Cont'l Air Lines*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Borders Grp., Inc.*, 453 B.R. 477, 482 (Bankr. S.D.N.Y. 2011) ("a debtor often satisfies the business judgment standard if 'the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'") (*quoting In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992)); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).

19.     Section 105 of the Bankruptcy Code provides, in relevant part, that "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). *See also In re Tusa-Expo Holdings, Inc.*, Case No. 08-45057-DML-11, 2008 WL 4857954, at *1 (Bankr. N.D. Tex. Nov. 7, 2008); *In re CEI Roofing, Inc.*, 315 B.R. 50, 56 (Bankr. N.D. Tex. 2004); *In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003).

i.      <u>Selling the Truck Terminal Pursuant to the Truck Terminal Sale Agreement Is a Reasonable Exercise of the Debtors' Sound Business Judgment and in the Best Interests of the Estates</u>

20.     The Debtors submit that selling the Truck Terminal represents a reasonable exercise of sound business judgment and is in the best interests of the Debtors' estates. The Debtors have considerable equity in the Truck Terminal that can be used to bolster the Debtors' reorganization

and liquidating the Debtors' equity in the Truck Terminal pursuant to the Truck Terminal Sale Agreement will generate cash while still enabling the Debtors to occupy and use the Truck Terminal pursuant to the terms of the proposed Leaseback Transaction. In effect, the Debtors anticipate that the Sale Transaction will generate at least $2.5 million in cash proceeds for the benefit of the Debtors' chapter 11 estates after reserving proceeds for lienholders claims. Monetizing such equity upon the terms of the Truck Terminal Sale Agreement (in light of the proposed Leaseback Transaction) provides the Debtors' with highly beneficial liquidity while the leaseback enables them to remain in the same location without incurring any moving expenses.

21.    The Debtors' proposed real estate broker, Younger Partners Dallas, LLC (the "Broker"), negotiated with the Stalking Horse Bidder and certain other interested parties. Following a solicitation and marketing process conducted by the Debtors' management and the Broker, the Debtors' management, along with their Broker and other advisors, determined that the Truck Terminal Sale Agreement is the highest or otherwise best offer available to the Debtors for the sale of the Truck Terminal. Accordingly, through this process, the Debtors have sought to obtain the best possible price for the Truck Terminal upon Court approval of the Motion. The Debtors submit that the relief contemplated by the Order allowing the Debtors to sell the Truck Terminal in a private sale transaction will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. Accordingly, the Debtors' determination to sell the Truck Terminal is a valid and sound exercise of the Debtors' business judgment and should be approved.

    ii.    <u>Entrance into the Lease Transaction Is a Reasonable Exercise of the Debtors' Sound Business Judgment and in the Best Interests of the Estates</u>

22.    The Debtors submit that entering into a definitive lease agreement consistent with the terms set forth in the Truck Terminal Sale Agreement represents a reasonable exercise of sound

business judgment and is in the best interests of the Debtors' estates. The Debtors require a headquarters from which to operate their businesses. Entering into the Leaseback Transaction will enable the Debtors to not relocate their businesses, uproot their employees, or otherwise disrupt the Debtors' businesses. Put simply, the Leaseback Transaction enables the Debtors to maintain continuity in their operations and is in the best interests of the Debtors' estates.

**B.**     ***The Sale of the Truck Terminal Pursuant to the Truck Terminal Sale Agreement Should be Approved "Free and Clear" under Section 363(f) of the Bankruptcy Code***

23.     Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of all liens, claims, interests, charges, and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets). Section 363(f) provides that:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
>
> > (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> >
> > (2) such entity consents;
> >
> > (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> >
> > (4) such interest is in bona fide dispute; or
> >
> > (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). As section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(f), it is only necessary to meet one of the five conditions of section 363(f). *In re Nature Leisure Times, LLC*, No. 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007) ("The language of § 363(f) is in the disjunctive such that a sale free and clear of an interest can be

approved if any one of the aforementioned conditions contained in § 363(f) are satisfied."). The

Debtors believe that they demonstrated their satisfaction of one or more of these conditions and,

in particular, that absent an objection to the sale of the Truck Terminal, any party with a claim or

interest in the Truck Terminal may be deemed to have consented to the sale.

C.      *The Sale of the Truck Terminals Has Been Proposed In Good Faith and Without Collusion, and the Stalking Horse Bidder Will Be a "Good Faith Purchaser"*

24.     Pursuant to section 363(m) of the Bankruptcy Code, a good-faith purchaser is one

who purchases assets for value, in good faith, and without notice of adverse claims.  *O'Dwyer v.*

*O'Dwyer (In re O'Dwyer)*, 611 Fed. App'x 195, 200 (5th Cir. 2015); *In re Mark Bell Furniture*

*Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th

Cir. 1985); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, *2 (Bankr. D.N.J. May 11,

2007); *see also In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (to constitute

lack of good faith, a party's conduct in connection with the sale must usually amount to fraud,

collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly

unfair advantage of other bidders).  Section 363(m) provides that:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease or property does
> not affect the validity of a sale or lease under such authorization to
> an entity that purchased or leased such property in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).

25.     In other words, a party would have to show fraud or collusion between the

purchaser and the debtor-in-possession or trustee or other bidders in order to demonstrate a lack

of good faith. An appropriate characterization of good faith in a bankruptcy sale is a lack of "fraud,

collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly

unfair advantage of other bidders." *In re Bleaufontaine, Inc.*, 634 F.2d 1383, 1388 n.7 (5th Cir. 1981) (*quoting In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

26.    The Debtors are seeking to sell the Truck Terminal only to a third-party, "good-faith" purchaser within the meaning of section 363(m) and at market prices without any collusion or fraud. Additionally, the Debtors will not sell the Truck Terminal to any "insider" or "affiliate" of any of the Debtors as those terms are defined in section 101 of the Bankruptcy Code. Accordingly, the Debtors contend that a purchaser of the Truck Terminal is entitled to the protections of section 363(m).

**D.    The Sale of the Truck Terminal Pursuant to the Truck Terminal Sale Agreement Is Appropriate under Bankruptcy Rule 6004**

27.    Bankruptcy Rule 6004(f)(1) permits a debtor to sell property of the estate outside of the ordinary course of its business by private sale. Fed. R. Bankr. P. 6004(f)(1). *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 436 (Bankr. S.D. Tex. 2009) ("[T]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction."). Courts generally afford debtors in possession broad discretion to determine the manner in which estate property is sold. *See, e.g., In re 9 Houston LLC*, 578 B.R. 600, 618 (Bankr. S.D. Tex. 2017); *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998); *In re Alisa P'ship*, 15 B.R. 802, 802 (Bankr. D. Del. 1981). Private sales by a debtor outside of the ordinary course of business are appropriate where the debtor articulates a good business reason for the private sale. *See, e.g., In re Schipper*, 933 F.2d 513, 514 (7th Cir. 1991) (private real estate sale by debtor approved when purchase price was the same as independent appraisal); *In re Condere Corp.*, 228 B.R. 615, 629 (Bankr. S.D. Miss. 1998) (authorizing private sale of debtor's tire company where "[d]ebtor has shown a sufficient business justification for the sale of the assets to the [p]urchaser"). Bankruptcy courts have a "large measure of discretion" in determining, "based upon the facts and

circumstances of the proposed sale," whether a private sale, as opposed to a public auction, is appropriate. *In re Embrace Sys. Corp.*, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995); *In re Blue Coal Corp.*, 168 B.R. 553, 564 (Bankr. M.D. Pa. 1994). In general, courts have approved private sales of less than all the assets of a debtor pursuant to section 363(b)(1) of the Bankruptcy Code as long as the debtor provides a valid business reason for not conducting an auction. *See, e.g., In re 9 Houston LLC*, 578 B.R. 600, 618 (Bankr. S.D. Tex. 2017) (approving private sale of real estate by emergency motion without bidding procedures or a stalking horse bidder); *In re Wellman, Inc.*, No. 08-10595 (SMB) (Bankr. S.D.N.Y. Oct. 6, 2008) (approving private sale of industrial complex for $17.9 million); *In re W.R. Grace & Co.*, No. 01-01139 (JKF) (Bankr. D. Del. July 23, 2007) (authorizing private sale of business line for approximately $22 million); *In re Solutia, Inc.*, No. 03-17949 (SCC) (Bankr. S.D.N.Y. Dec. 28, 2006) (approving private sale of real property for approximately $7.1 million).

28.     In an exercise of their sound business judgment, the Debtors have determined that consummating the sale of the Truck Terminal on a private basis is appropriate in light of the facts and circumstances of these Chapter 11 Cases and the reality of the transparent marketplace for the sale of real estate in the Dallas-Fort Worth Metroplex. A public auction would require the Debtors to incur additional costs for a process the Debtors—in conjunction with discussions with the Broker and the Debtors' other advisors—do not believe is likely to result in additional value sufficient to justify the incurrence of such costs. In the Debtors' business judgment, it is unlikely that a superior price would be found in a public auction within the time frame required. Given these circumstances, the Debtors believe that the private sale of the Truck Terminal is appropriate under the circumstances. In the event that a higher offer comes forward, certain bid protections ensure that such higher offer can be vetted.

E.      *The Stalking Horse Bid Protections Are Reasonable and Appropriate*

29.      The Debtors have agreed to provide standard bid protections to the Stalking Horse

Bidder in the form of a break-up fee of 5% of the purchase price (the "Stalking Horse Bid

Protections"). Bid protections such as these Stalking Horse Bid Protections have become

commonplace in connection with sales under chapter 11. Further, the Debtors believe that granting

the Stalking Horse Bid Protections to the Stalking Horse Bidder is fair and reasonable under the

circumstances. Courts have acknowledged that the approval of break-up fees in connection with

substantial sales in bankruptcy is warranted to compensate an unsuccessful acquirer whose initial

offer served as the basis and catalyst for higher or better offers. *See ASARCO, Inc. v. Elliott Mgmt.*

*(In re ASARCO, L.L.C.)*, 650 F.3d 593, 597–98, 601–03 & n.9 (5th Cir. 2011); *In re JW Res., Inc.*,

536 B.R. 193, 195–96 (Bankr. E.D. Ky. 2015); *In re Hupp Indus., Inc.*, 140 B.R. 191, 195 (Bankr.

N.D. Ohio 1992). As listed in *Hupp Industries*, courts consider various factors in determining

whether to authorize break-up fees, such as:

     a.  whether the fee requested correlates with a maximization of value to the debtor's estate;

     b.  whether the transaction in the negotiated agreement is an arms'-length transaction between the debtor's estate and the negotiating acquirer;

     c.  whether the principal secured creditors are supportive of the concession;

     d.  whether the subject break-up fee constitutes a fair and reasonable percentage of the proposed purchase price;

     e.  the existence of available safeguards beneficial to the debtor's estate; and

     f.  whether there exists a substantial adverse impact upon unsecured creditors, where such creditors are in opposition to the break-up fee.

*Hupp Indus.*, 140 B.R. at 194–96.

30.      To warrant court approval of such break-up fees and expenses, the Fifth Circuit in

*ASARCO* required a showing that the requested fees and expenses must be supported by a sound

business justification. *ASARCO*, 650 F.3d at 602–03 (favoring business judgment standard governing use of assets outside of the ordinary course of business, rather than the standard for administrative expenses, in assessing propriety of fees and expenses incurred by bidders).

31.     Here, the Stalking Horse Bid Protections satisfy the foregoing tests because they are: (i) actual and necessary costs and expenses of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code; (ii) commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder; (iii) reasonable and appropriate, in light of the size and nature of the proposed Sale Transaction and comparable transactions, to the commitments that have been made and the efforts that have been, and are expended, by the Stalking Horse Bidder; (iv) necessary to induce the Stalking Horse Bidder to continue to pursue the Sale Transaction and to continue to be bound by any purchase agreement; and (v) subject to all parties-in-interests' rights to object and be heard with respect to approval of the Stalking Horse Bid Protections.

32.     *First*, the Stalking Horse Bid Protections have only been provided after good faith, arms' length negotiations with the Debtors who acted in the interest of their estates, consistent with their fiduciary duties. Parties in interest will be given notice and an opportunity to object if they do not believe that the Stalking Horse Bid Protections are in the best interests of the Debtors' estates.

33.     *Second*, the Debtors are proposing Stalking Horse Bid Protections that promote the interests of the Debtors' estates to maximize value because such protections promote higher offers for the Truck Terminal by inducing the Stalking Horse Bidder to hold their offer open as a minimum bid on which other interested parties (and the Debtors) can rely. In doing so, the Stalking Horse Bidder is laying the foundation for the Debtors' sale process and serving as a catalyst for

Overbids. Accordingly, the Stalking Horse Bid Protections are appropriate and the Stalking Horse Bidder is entitled to be compensated for the risk it is assuming and the substantial value it is conferring on the Debtors' estates.

34.    *Third*, the Stalking Horse Bid Protections are reasonable in view of the substantial benefits the Debtors would receive from having the Stalking Horse Bid serve as the floor for potential other interested parties—should there be any. Moreover, the Truck Terminal Sale Agreement provides the Debtors with an opportunity to move forward with the Sale Transaction that has a high likelihood of consummation with a contractually committed party at a fair and reasonable purchase price. Accordingly, the Stalking Horse Bid Protections will not deter offers from additional parties, are reasonable, and maximize the value of the Debtors' estates.

35.    Moreover, it is unlikely that the Stalking Horse Bidder would have agreed to commence diligence on the proposed Sale Transaction or agreed to act as stalking horse bidder without being granted the Stalking Horse Bid Protections. Without the Stalking Horse Bid Protections, the Debtors might lose the opportunity to obtain the highest and best offer for the Truck Terminal and would certainly delay the liquidity infusion from the closing of a sale by more than a month in the absence of the Debtors' agreement to provide Stalking Horse Bid Protections.

36.    The Stalking Horse Bid Protections, consisting of a break-up fee of 5% of the purchase price, falls within the range of stalking horse bid protections approved by courts across the county. *See, e.g., In re Geokinetics Inc.*, No. 18-33410 (DRJ) (Bankr. S.D. Tex. July 2, 2018) (ECF No. 110) (approving break-up fee equal to 5% percent of the purchase price and expense reimbursement not to exceed $1 million); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019) (ECF No. 150) (approving break-up fee and expense reimbursement equal to 4.4% of the purchase price); *In re Weinstein Co. Holdings LLC*, 18- 10601 (MFW) (Bankr.

D. Del. Apr. 6, 2018) (ECF No. 190) (approving break-up fee equal to 3% of the purchase price and expense reimbursement not to exceed 2% of the purchase price).   And other courts have approved 3% break-up fees alongside incremental expense reimbursement benefits.   *See e.g., In re McDermott Int'l, Inc.*, No. 20-30336 (DRJ) (Bankr. S.D. Tex. Feb 24, 2020) (ECF No. 476) (approving break-up fee equal to 3% percent of the purchase price and expense reimbursement not to exceed $25 million); *In re Neighbors Legacy Holdings, Inc.*, No. 18-33836 (MI) (Bankr S.D. Tex. Aug. 8, 2018) (ECF No. 203) (approving break-up fee equal to 3% and expense reimbursement not to exceed $320,000).

37.     For all of the foregoing reasons, the Debtors believe that granting the Stalking Horse Bid Protections maximize the value realized for the benefit of the Debtors' estates, their creditors, and other parties-in-interest.

**F.     *The Overbid Requirements Are Fair and Reasonable***

38.     The Overbid Requirements are reasonable and appropriate and should be approved as proposed. Section 363 of the Bankruptcy Code permits the sale of all or some of a debtor's assets. Moreover, under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). In essence, the Court may enter an order that safeguards the value of the debtor's estate if doing so is consistent with the Bankruptcy Code. *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Tr., Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (acknowledging that "the [b]ankruptcy [c]ourt is one of equity and as such it has a duty to protect whatever equities a debtor

may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

39.     To that end, courts recognize that protocols intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate, and, therefore, are appropriate in the context of bankruptcy sales. *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").

40.     The Overbid Requirements provide for an orderly, uniform, and competitive process through which interested parties may submit offers to purchase the Truck Terminal. The Debtors, with the assistance of their advisors, have structured the Overbid Requirements to promote genuine bidding by interested parties and to reach the highest or otherwise best offer reasonably available for the Truck Terminal.  The Overbid Requirements provide the Debtors with an adequate opportunity to consider competing bids from interested parties ready and willing to close a transaction, and to select the highest or otherwise best offer for the potential completion of the Sale Transaction.

41.     Moreover, an orderly and expeditious sale process is critical to preserve and realize the Debtors' value and maximize recoveries for the Debtors' stakeholders. In formulating the Overbid Requirements, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and potential bidders with the need to quickly and efficiently run a sale process in parallel with a solicitation process. The Overbid Requirements provide for the marketing of the Truck Terminal to pursue higher or better value than the Stalking Horse Bidder. Accordingly, the Overbid Requirements should be approved.

## <u>REQUEST FOR WAIVER OF STAY</u>

42.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion satisfies Bankruptcy Rule 6004(a) and that the Court waive the 14-day period under Bankruptcy Rule 6004(h).

## <u>RESERVATION OF RIGHTS</u>

43.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) an impairment, waiver or limitation of the Debtors' or any appropriate party-in-interest's rights to dispute the amount of, basis for, or validity of any claim against, or interest in, the Debtors, their property or their estates, (iii) an impairment or waiver of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an approval, adoption, assumption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code, (v) a promise or requirement to pay any prepetition claim, (vi) an implication or admission that any particular claim is of a type specified or defined in the Motion, or any order granting the relief requested by the Motion, (vii) an implication, admission, or finding as to (a) the validity, enforceability, or perfection of any interest or encumbrance on the property of the Debtors or their estates or (b) the applicability of any exception or exclusion from property of the estates under Section 541 of the Bankruptcy Code or other applicable law, or (viii) an impairment or waiver of any claims or causes of action which may exist against any entity. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party-in-interest's rights to dispute such claim.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested

herein and such other and further relief as the Court may deem just and proper.

Dated: June 4, 2025                              Respectfully submitted,


                                                 */s/ Eric T. Haitz*
                                                 **BONDS ELLIS EPPICH SCHAFER JONES LLP**
                                                 Joshua N. Eppich      (Texas Bar No. 24050567)
                                                 Eric T. Haitz      (Texas Bar No. 24101851)
                                                 420 Throckmorton Street, Suite 1000
                                                 Fort Worth, Texas 76102
                                                 (817) 405-6900 telephone
                                                 (817) 405-6902 facsimile
                                                 Email: joshua@bondsellis.com
                                                 Email: eric.haitz@bondsellis.com

                                                 -and-

                                                 Ken Green      (Texas Bar No. 24050698)
                                                 402 Heights Boulevard
                                                 Houston, Texas 77007
                                                 (713) 335-4990 telephone
                                                 (713) 335-4991 facsimile
                                                 Email: ken.green@bondsellis.com

                                                 PROPOSED COUNSEL FOR THE DEBTORS
                                                 AND DEBTORS IN POSSESSION


## CERTIFICATE OF SERVICE

I, Eric T. Haitz, certify that on June 4, 2025, I caused the foregoing Motion to be served by the Court's CM/ECF system on all parties requesting or consenting to such service in this case, and via USPS First Class mail on the service list attached hereto.

                                                 */s/ Eric T. Haitz*
                                                 Eric T. Haitz

*Proposed Order*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| | § | **Case No. 25-41544** |
| **BALKAN EXPRESS, LLC,** *et al.* | § | |
| | § | **(Jointly Administered)** |
| **Debtors.[1]** | § | |
| | § | |

**ORDER (A) AUTHORIZING THE DEBTORS TO (I) ENTER INTO THE TRUCK
TERMINAL SALE AGREEMENT AND (II) ENTER INTO THE LEASE AGREEMENT
AND CONSUMMATE THE LEASEBACK TRANSACTION; (B) APPROVING (I) THE
STALKING HORSE BID PROTECTIONS, AND (II) THE OVERBID
REQUIREMENTS; AND (C) GRANTING RELATED RELIEF**

Upon the Motion[2] of the above-captioned debtors and debtors in possession (collectively,

the "Debtors") for entry of an order pursuant to sections 105(a) and 363 of the Bankruptcy Code

---

[1]  The Debtors in these jointly administered chapter 11 cases, along with the last four digits of each Debtor's
federal tax identification number, are: Balkan Express, LLC (3974), and Balkan Logistics, LLC (8202). The
Debtors' mailing address is 2560 E Long Ave, Fort Worth, Texas 76137.

[2]  Where context requires, capitalized terms used but not otherwise defined herein shall have the meanings ascribed
to such terms in the Motion.

and Bankruptcy Rules 2002, 6004, and 9014 (a) authorizing, but not directing, the Debtors to

(i) enter into the Truck Terminal Sale Agreement and (ii) enter into the Lease Agreement and

consummate the Leaseback Transaction; (b) approving (i) the Stalking Horse Bid Protections, and

(ii) the Overbid Requirements; and (c) granting related relief; and upon consideration of the First

Day Declaration, the evidence and argument of counsel at the hearing on the Motion; and this

Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28

U.S.C. § 1334; and consideration of the Motion and the requested relief being a core proceeding

pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to

28 U.S.C. §§ 1408 and 1409; and due, and proper notice of the Motion having been provided; and

such notice having been adequate and appropriate under the circumstances, and it appearing that

no other or further notice need be provided; and this Court having reviewed the Motion; and all

objections, if any, to the Motion having been withdrawn, resolved, or overruled; and this Court

having determined that the legal and factual bases set forth in the Motion establish just cause for

the relief granted herein; and it appearing that the relief requested in the Motion is in the best

interests of the Debtors and their respective estates and creditors; and upon all of the proceedings

had before this Court and after due deliberation and sufficient cause appearing therefor

**IT IS HEREBY FOUND AND DETERMINED THAT**

A.   <u>Statutory and Legal Predicates</u>.  The predicates for relief granted herein are sections

105 and 363 of the Bankruptcy Code, Rules 2002, 6004 and 9014 of the Bankruptcy Rules, and

Rules 2002-1 and 9013-1 of the Local Rules.

B.   <u>Truck Terminal Sale Agreement</u>.  The Debtors have articulated good and sufficient

business reasons for the Debtors to enter into and perform under the Truck Terminal Sale

Agreement.

C.     <u>Definitive Lease Agreement</u>.  The Debtors have articulated good and sufficient business reasons for the Debtors to enter into and perform under a definitive lease agreement pursuant to a Leaseback Transaction substantially upon the terms set forth in the Truck Terminal Sale Agreement.

D.     <u>Overbid Requirements</u>.  The Debtors have articulated good and sufficient business reasons for the Court to approve the Overbid Requirements.  The Overbid Requirements are fair, reasonable, and appropriate.  The Overbid Requirements are reasonably designed to promote a competitive and robust overbid process resulting in the highest or otherwise best offer for the Truck Terminal.

E.     <u>Notice</u>.  All notices provided by the Motion are good and sufficient notice to all parties in interest of all matters pertinent hereto. No further notice is or shall be required.

F.     <u>Relief is Warranted</u>.  The legal and factual bases set forth in the Motion and at the hearing held on the Motion establish just and sufficient cause to grant the relief requested therein.

**IT IS HEREBY ORDERED THAT**:

1.     All objections to the relief granted herein that have not been withdrawn with prejudice, waived, or settled, and all reservations of rights included in such objections, are hereby overruled and denied on the merits with prejudice.

2.     The Debtors are authorized, but not directed, to enter into the Truck Terminal Sale Agreement and consummate the Sale Transaction.

3.     The Debtors are authorized, but not directed, to enter into a definitive lease agreement consistent with the terms specified in the Truck Terminal Sale Agreement and consummate the Leaseback Transaction.

4.      Subject to the terms of this Order and the Truck Terminal Sale Agreement, the dates

and deadlines set forth in this Order are subject to modification by the Debtors and upon proper

notice to parties in interest, without further order of this Court.

5.      The Overbid Requirements set forth below are hereby approved:

a.  Timing.  Each Overbid must be submitted no later than July 18, 2025.

b.  Purchase Price. Each Overbid must clearly identify the purchase price to be
paid and specify the aggregate amount of cash and other consideration being
offered.

c.  Deposit:  Each Overbid must include delivery of a cash deposit to the client
trust account of Debtors' counsel in an amount equal to the Stalking Horse
Protections *plus* 15% of the Potential Bidder's proposed purchase price.

d.  Unconditional Offer / Contingencies. A statement that the Overbid is
formal, binding, and unconditional, is not subject to any further due
diligence or financing contingency, and is irrevocable until the Debtors
notify the Potential Bidder that such Bid is not a Successful Bid or a Back-
Up Bid, or until the first business day after the closing of the Sale
Transaction.

e.  Proof of Financial Ability to Perform. Each Overbid must contain such
financial and other information that allows the Debtors to make a reasonable
determination as to the Potential Bidder's financial and other capabilities to
consummate the Sale Transaction including, without limitation, ability to
post replacement letters of credit, as applicable. Without limiting the
foregoing, such information must include current financial statements or
similar financial information certified to be true and correct as of the date
thereof, proof of financing commitments if needed to consummate the
transaction (not subject to, in the Debtors' reasonable business judgment,
any unreasonable conditions), contact information for verification of such
information, including any financing sources, and any other information
reasonably requested by the Debtors.

f.  Required Approvals. Each Overbid must contain a statement or evidence (i)
that the Potential Bidder has not conditioned its Overbid on (a) obtaining
financing, (b) any internal approval, (c) the outcome or review of
unperformed due diligence, or (d) regulatory contingencies.

g.  Representations and Warranties. Each Overbid must include the following
representations and warranties.

- a statement that the Potential Bidder has had an opportunity to conduct, and has completed, any and all due diligence regarding the applicable business or asset prior to submitting its Overbid;

- a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the businesses or assets in making its Bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the businesses or assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Potential Bidder's Overbid ultimately accepted and executed by the Debtors;

- a statement that the Potential Bidder has not (i) engaged in any collusion with respect to the submission of any Overbid, (ii) coordinated or joined with any other party on a bid or Overbid, or (iii) taken any other action to prevent a transparent and competitive auction process; and

- a statement that all proof of financial ability to consummate the proposed transaction in a timely manner and all information provided to support the Overbid is true and correct.

6.     The procedures and requirements set forth in the Overbid Requirements are fair, reasonable and appropriate, and are designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and all parties in interest.

7.      The Debtors are authorized to take all reasonable actions necessary or appropriate to implement the provisions of this Order in accordance with the terms of this Order and the Overbid Requirements.

8.     The Stalking Horse Bidder is entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code, including in the event this Order or any portion thereof is reversed or modified on appeal.

9.     The Debtors are further authorized, but not directed, to take any actions required to effectuate the sale of the Truck Terminal.

10.     Any liens against the Truck Terminal shall attach to and be automatically perfected as to the proceeds from the sale authorized hereby.

11.     Nothing in this Order shall be deemed to require the Debtors to take any action, or to refrain from taking any action, with respect to the Sale Transaction, to the extent that the Debtors reasonably determine in good faith, in consultation with outside counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

12.     Under the circumstances of these Chapter 11 Cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

13.     Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

14.     The Debtors are authorized to take all actions necessary or appropriate to carry out the relief granted in this Order.

15.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

### # # # END OF ORDER # # #

*Order Proposed By*:

Joshua N. Eppich (TBN 24050567)
Ken Green (TBN 24050698)
Eric T. Haitz (TBN 24101851)
**BONDS ELLIS EPPICH SCHAFER JONES LLP**
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: joshua@bondsellis.com
Email: ken.green@bondsellis.com
Email: eric.haitz@bondsellis.com

*Proposed Counsel for*
*Debtors and Debtors-in-Possession*

# EXHIBIT A

## *Truck Terminal Sale Agreement*



**NORTH TEXAS COMMERCIAL ASSOCIATION OF REALTORS®**

**AMENDED AND RESTATED COMMERCIAL CONTRACT OF SALE**

In consideration of the agreements contained in this Amended and Restated Commercial Contract of Sale (the "**Contract**"), Seller shall sell and convey to Purchaser, and Purchaser shall buy and pay for, the Property (defined below) pursuant to the provisions, and subject to the conditions, of this Contract.

1. **PARTIES.** The parties to this Contract are:

    **Seller:** Balkan Express LLC
    Address: 2560 E. Long Avenue, Fort Worth, Texas 76137
    Phone: _____ Fax: _____
    Email: _____

    **Purchaser:** CanTex RE Holdings, LLC
    Address: 107 Pittsburg Street, Dallas, Texas 75207
    Phone: 214.785.2452  Fax: _____
    Email: rcheema@cantexcapital.com

2. **PROPERTY.** The address of the Property is:
    2560 E. Long Avenue, Fort Worth, Texas 76137
    _____

    The Property is located in Tarrant County, Texas, the land portion of which is further described as: LONG AVE IND DISTRICT ADDN Block 1 Lot 3R
    _____

    and as shown on **Exhibit "A"**, **SITE PLAN**. The Property includes all improvements, fixtures, and personal property situated thereon, and all rights and appurtenances pertaining thereto, including any right, title and interest of Seller in and to adjacent streets, alleys, and rights-of-way (such land, improvements, fixtures, personal property, rights and appurtenances being collectively referred to in this Contract as the "**Property**").

Seller's Initials Zk _____ _____ Purchaser's Initials RC _____
©Copyright 2015 NTCAR - Form No. 1 (11/2015)                                    Page 1 of 20

3. **PURCHASE PRICE.**

    A.   **Amount and Payable.** The purchase price for the Property is $4,000,000.00 (the "**Purchase Price**"), payable at the Closing as follows (with the Earnest Money to be applied to the Purchase Price):

        **(1)** All in cash (meaning Good Funds, as defined in <u>Section 4.F.</u> below).

The Purchase Price may be increased by Purchaser in the event Seller receives a higher offer for the purchase of the Property.

4. **EARNEST MONEY AND TITLE COMPANY ESCROW.**

    A.   **Title Company.** The Title Company to serve as escrow agent for this Contract is (the "**Title Company**"):

| | |
|---|---|
| Company: | Capital Title of Texas |
| Address: | 13155 Noel Road, Suite 825, Dallas, Texas 75240 |
| Contact: | Jennifer McCormick |
| Phone: | 972.398.7270 |
| Fax: | 833.350.1144 |
| Email: | jmccormick@ctot.com |

    B.   **Effective Date.** The "**Effective Date**" is the date the Title Company acknowledges receipt of this fully executed Contract as indicated by the signature block for the Title Company.

    C.   **Earnest Money.** Within two (2) Business Days after the Effective Date, Purchaser shall deliver an earnest money deposit in the amount of $50,000.00 (the "**Earnest Money**"), payable to the Title Company in its capacity as escrow agent, to be held in escrow pursuant to the terms of this Contract. Seller's acceptance of this Contract is expressly conditioned upon Purchaser's timely deposit of the Earnest Money with the Title Company. If Purchaser fails to timely deposit the Earnest Money with the Title Company, then Seller may, at Seller's option, terminate this Contract by delivering a written termination notice to Purchaser at any time until Purchaser deposits the Earnest Money with the Title Company, <u>which is Seller's sole and exclusive remedy in such event.</u>

    Purchaser instructs the Title Company to promptly deposit the Earnest Money in one or more insured accounts in a state or federal banking or savings institution. After receipt of necessary tax forms from Purchaser, the Title Company will deposit the Earnest Money in an interest bearing account unless this box ☐ is checked, in which case the Title Company will not be required to deposit the Earnest Money in an interest bearing account. Any interest earned on the Earnest Money will become a part of the Earnest Money. At the Closing, the Earnest Money will be applied to the Purchase Price or, at Purchaser's option, will be returned to Purchaser upon full payment of the Purchase Price.

    D.   **Independent Consideration.** Notwithstanding anything in this Contract to the contrary, a portion of the Earnest Money in the amount of $100.00 will be non-refundable and will be distributed to Seller upon any termination of this Contract as independent consideration for Seller's performance under this Contract. If this Contract is properly terminated by Purchaser pursuant to a right of termination granted to Purchaser by any provision of this Contract, the Earnest Money will be promptly returned to Purchaser, <u>and no additional release shall be required upon the Title Company's receipt of such termination.</u> Any provision of this Contract that states

Seller's Initials _____   _____ Purchaser's Initials _____ _____

©Copyright 2015 NTCAR - Form No. 1 (11/2015)

that the Earnest Money is to be returned to Purchaser means that the Earnest Money, less the non-refundable portion, is to be returned to Purchaser.

E.    **Escrow.**    The Earnest Money is deposited with the Title Company with the understanding that the Title Company is not: (1) responsible for the performance or non-performance of any party to this Contract; or (2) liable for interest on the funds except to the extent interest has been earned after the funds have been deposited in an interest bearing account.

F.    **Definition of Good Funds.**   "Good Funds" means currently available funds, in United States dollars, paid in the form of a certified check, cashier's check, official bank check or wire transfer acceptable to the Title Company, such that the payment may not be stopped by the paying party. Any reference in this Contract to "cash" means Good Funds.

5.  **SURVEY AND TITLE.**

A.    **Survey.**   Within <u>five (5)</u> days after the Effective Date:

Seller shall deliver to Purchaser a copy of the most recent existing survey (the "**Survey**") of the Property in Seller's possession. Seller shall also deliver an Affidavit to the Title Company, in form and substance reasonably satisfactory to the Title Company, stating that none of the improvements on the Property and other matters shown by the existing Survey have changed since the existing Survey was prepared. If Purchaser, Purchaser's lender or the Title Company requires a new survey for any reason, then Purchaser shall pay for the cost of the new Survey, and Seller will give a credit to Purchaser against the Purchase Price at the Closing for the cost of the new Survey in an amount not to exceed <u>$5,000.00</u>.

Any new Survey must:
>  (1) be prepared by a Registered Professional Land Surveyor;
>  (2) be in a form reasonably acceptable to Purchaser and the Title Company;
>  (3) set forth a legal description of the Property by metes and bounds or by reference to a platted lot or lots;
>  (4) show that the Survey was made on the ground with corners marked with monuments either found or placed;
>  (5) show any discrepancies or conflicts in boundaries, and any visible encroachments;
>  (6) contain the surveyor's certificate that the Survey is true and correct; and
>  (7) show the location and size of all of the following on or immediately adjacent to the Property, if any, if recorded or visible and apparent:
>>     (a) buildings,
>>     (b) building set back lines (as shown on any recorded plat, but not as may be described in any restrictive covenants or zoning ordinances),
>>     (c) streets and roads,
>>     (d) 100-year flood plain (approximate location),
>>     (e) improvements,
>>     (f) encroachments,
>>     (g) easements,
>>     (h) recording information of recorded easements,
>>     (i) pavements,
>>     (j) protrusions,

(k) fences,

(l) rights-of-way, and

(m) any markers or other visible evidence of utilities.

Any area of the Property within the 100-year flood plain will be shown on the Survey as the approximate location of the 100-year flood plain as shown on any map prepared by the Federal Emergency Management Agency or other applicable governmental authority. The surveyor is authorized to determine the area of the Property within any 100-year flood plain as shown on any map prepared by any governmental authority, and in the absence of such a map, as otherwise reasonably determined by the surveyor. If the area within any 100-year flood plain is to be deducted for the purpose of determining gross land area then the Survey must show the area of the Property covered by the 100-year flood plain, and that area, as reasonably determined by the surveyor, will be conclusive for purposes of this Contract, even though the surveyor may qualify that determination as approximate.

After the delivery of the Survey, the legal description of the Property set forth in the Survey will be incorporated in this Contract as the legal description of the Property, and will be used in the deed and any other documents requiring a legal description of the Property.

The Survey must show the gross land area of the Property.

B.   **Title Commitment.**   Within <u>five (5)</u> days after the Effective Date, Seller shall deliver or cause to be delivered to Purchaser:

(1) A title commitment (the "**Title Commitment**") covering the Property binding the Title Company to issue a Texas Owner Policy of Title Insurance (the "**Title Policy**") on the standard form prescribed by the Texas Department of Insurance at the Closing, in the full amount of the Purchase Price, insuring Purchaser's fee simple title to the Property to be good and indefeasible, subject only to the Permitted Exceptions (defined below); and

(2) the following (collectively, the "**Title Documents**"):

(a) true and legible copies of all recorded instruments affecting the Property and recited as exceptions in the Title Commitment;

(b) a current tax certificate;

(c) any written notices required by applicable statutes, including those referenced in <u>Section 20</u>; and

(d) if the Property includes any personal property, UCC search reports pertaining to the Seller.

<u>Seller shall pay any expense for delivery of the Title Commitment and Title Documents.</u>

6.  **REVIEW OF SURVEY AND TITLE.**

A.   **Title Review Period.**   Purchaser will have <u>fifteen (15)</u> days (the "**Title Review Period**") after receipt of the last of the Survey <u>or any new Survey obtained by Purchaser</u>, Title Commitment and Title Documents to review them and to deliver a written notice to Seller stating any objections Purchaser may have to them or any item disclosed by them. Purchaser's failure to object within the time provided will be a waiver of the right to object. Any item to which Purchaser does not object will be deemed a "**Permitted Exception**". The items set forth on <u>Schedule C</u> of the Title Commitment, and any other items the Title Company identifies to be released

upon the Closing, will be deemed objections by Purchaser <u>which Seller shall be required to cure on or before the</u> <u>Closing Date</u>. Zoning ordinances and the lien for current taxes are deemed to be Permitted Exceptions.

      B.    **Cure Period**. If Purchaser delivers any written objections to Seller within the Title Review Period, then Seller shall make a good faith attempt to cure the objections within ten (10) days (the "**Cure Period**") after receipt of the objections. However, Seller is not required to incur any cost to do so. If Seller cannot cure the objections within the Cure Period, Seller may deliver a written notice to Purchaser, before expiration of the Cure Period, stating whether Seller is committed to cure the objections at or before the Closing. If Seller does not cure the objections within the Cure Period, or does not timely deliver the notice, or does not commit in the notice to fully cure all of the objections at or before the Closing, then Purchaser may terminate this Contract by delivering a written notice to Seller on or before the scheduled Closing Date. Seller will seek a court order that the sale of the Property is free of all claims, liens and encumbrances, and Purchaser is a good faith purchaser.

      C.    **New Items**. If any new items are disclosed by any new or updated Survey, updated Title Commitment, or any new Title Documents, that were not disclosed to Purchaser when the Survey, Title Commitment, and Title Documents were first delivered to Purchaser, then Purchaser will have 15 days to review the new items and to deliver a written notice to Seller stating any objections Purchaser may have to the new items. If Purchaser timely delivers any written objections as to the new items to Seller, then Seller shall make a good faith attempt to cure the objections to the new items within 10 days (the "**Additional Cure Period**") after receipt of the objections as to the new items. However, Seller is not required to incur any cost to do so. If Seller does not cure the objections as to the new items within the Additional Cure Period, or does not deliver a written notice to Purchaser before the expiration of the Additional Cure Period stating whether Seller is committed to cure the objections as to the new items at or before the Closing, then Purchaser may terminate this Contract by delivering a written notice to Seller on or before the scheduled Closing Date.

      D.    **Return of Earnest Money or Waiver.** If Purchaser properly and timely terminates this Contract, the Earnest Money will be returned to Purchaser. If Purchaser does not properly and timely terminate this Contract, then Purchaser will be deemed to have waived any uncured objections and must accept title at the Closing subject to the uncured objections and other Permitted Exceptions. Seller's failure to cure Purchaser's objections under this <u>Section 6</u> does not constitute a default by Seller.

    7.  **SELLER'S REPRESENTATIONS.**

    A.  **Statements.**  Seller represents to Purchaser, to the best of Seller's knowledge, as follows:

      (1) **Title**.  At the Closing, Seller will convey to Purchaser good and indefeasible fee simple title to the Property free and clear of any and all liens, assessments, easements, security interests and other encumbrances except the Permitted Exceptions. Delivery of the Title Policy pursuant to <u>Section 15</u> (the Closing) will be deemed to satisfy the obligation of Seller as to the sufficiency of title required under this Contract. However, delivery of the Title Policy will not release Seller from the warranties of title set forth in the warranty deed.

      (2) **Leases**.  There are no parties in possession of any portion of the Property as lessees, tenants at sufferance or trespassers except tenants under written leases delivered to Purchaser pursuant to this Contract.

      (3) **Liens and Debts.**  There are no mechanic's liens, Uniform Commercial Code liens or unrecorded liens against the Property, and Seller shall not allow any such liens to attach to the Property before the

Closing that will not be satisfied out of the Closing proceeds. All obligations of Seller arising from the ownership and operation of the Property and any business operated on the Property, including, but not limited to, taxes, leasing commissions, salaries, contracts, and similar agreements, have been paid or will be paid before the Closing. Except for obligations for which provisions are made in this Contract for prorating at the Closing and any indebtedness taken subject to or assumed, there will be no obligations of Seller with respect to the Property outstanding as of the Closing.

(4) **Litigation.** There is no pending or threatened litigation, condemnation, or assessment affecting the Property. Seller shall promptly advise Purchaser of any litigation, condemnation or assessment affecting the Property that is instituted after the Effective Date.

(5) **Material Defects.** Seller has disclosed to Purchaser any and all known conditions of a material nature with respect to the Property which may affect the health or safety of any occupant of the Property. Except as disclosed in writing by Seller to Purchaser, the Property has no known latent structural defects or construction defects of a material nature, and none of the improvements have been constructed with materials known to be a potential health hazard to occupants of the Property.

(6) **Hazardous Materials.** Except as otherwise disclosed in writing by Seller to Purchaser, the Property (including any improvements) does not contain any Hazardous Materials (defined below) other than lawful quantities properly stored in containers in compliance with applicable laws.

B. **Remedies.** If Purchaser discovers, before the Closing, that any of Seller's representations has been misrepresented in a material respect, Purchaser may notify Seller of the misrepresentation in writing, and Seller shall attempt to correct the misrepresentation. If the misrepresentation is not corrected by Seller before the Closing, Purchaser may: (1) proceed to Closing, without waiving any claim for misrepresentation; or (2) terminate this Contract by delivering a written termination notice to Seller, in which case the Earnest Money will be returned to Purchaser.

8. **OPERATION OF THE PROPERTY.** After the Effective Date until the Closing Date, Seller shall: (1) operate the Property in the same manner as the Property has been operated by Seller; and (2) maintain the Property in the same condition as existed on the Effective Date, except for ordinary wear and any casualty loss. After the Effective Date, Seller shall not, without Purchaser's prior written approval: (1) further encumber the Property or allow an encumbrance upon the title to the Property, or modify the terms of any existing encumbrance, if the encumbrance would still be in effect after Closing; or (2) enter into any lease or contract affecting the Property, if the lease or contract would still be in effect after Closing. However, Seller may enter into a lease or contract with an independent third party, in the ordinary course of business, without Purchaser's consent, if Purchaser will be entitled to terminate the lease or contract after Closing, without incurring any termination charge, by delivering a termination notice thirty (30) days in advance of the termination date. If Seller enters into any lease or contract affecting the Property after the Effective Date, then Seller shall immediately deliver a photocopy of the signed document to Purchaser.

9. **NONCONFORMANCE.** Purchaser has or will independently investigate and verify to Purchaser's satisfaction the extent of any limitations of uses of the Property. Purchaser acknowledges that the current use of the Property or the improvements located on the Property (or both) may not conform to applicable Federal, State or municipal laws, ordinances, codes or regulations. Zoning, permitted uses, height limitations, setback requirements, minimum parking requirements, limitations on coverage of improvements to total area of land, Americans with Disabilities Act requirements, wetlands restrictions and other matters may have a significant economic impact upon the intended use of the Property by Purchaser. However, if Seller is aware of any pending

zoning changes or current nonconformance with any Federal, State or local laws, ordinances, codes or regulations, Seller shall disclose same to Purchaser.

## 10. INSPECTION.

A.    **Inspection Desired**. Purchaser desires to inspect the Property, and Seller grants to Purchaser the right to inspect the Property as described below.

(1)    **Inspection Period.** Purchaser will have a period of <u>forty-five (45)</u> days after the Effective Date (the "**Inspection Period**") to inspect the Property and conduct studies regarding the Property. Purchaser's studies may include, without limitation: (a) permitted use and zoning of the Property; (b) core borings; (c) environmental and architectural tests and investigations; (d) physical inspections of improvements, fixtures, equipment, subsurface soils, structural members, and personal property; and (e) examination of agreements, manuals, plans, specifications and other documents relating to the construction and condition of the Property. Purchaser and Purchaser's agents, employees, consultants and contractors will have the right of reasonable entry onto the Property during normal business hours, and upon reasonable advance notice to Seller and any tenants on the Property, for purposes of inspections, studies, tests and examinations deemed necessary by Purchaser. The inspections, studies, tests and examinations will be at Purchaser's expense and risk, <u>provided that Seller shall be responsible for the cost of the Phase I environmental report and any Phase II environmental report or other testing if such additional reports and/or testing are recommended in the Phase I environmental report obtained by Purchaser.</u> Purchaser may also use the Inspection Period to perform feasibility studies, obtain equity funding, seek financing, and satisfy other conditions unrelated to the condition of the Property. Purchaser shall defend and indemnify Seller against any claims that arise due to any actions by Purchaser or Purchaser's agents, employees, consultants and contractors with the exception of pre-existing conditions affecting the Property that Purchaser merely discovers. Purchaser's obligation to defend and indemnify Seller will survive the Closing or termination of this Contract.

(2)    **Extension of Inspection Period.**  Purchaser may extend the Inspection Period for up to <u>fifteen (15)</u> days.

(3)    **Termination.** If Purchaser determines, in Purchaser's sole discretion, no matter how arbitrary, that Purchaser chooses not to purchase the Property for any reason, then Purchaser may terminate this Contract by delivering a written notice to Seller on or before the last day of the Inspection Period, in which case the Earnest Money will be returned to Purchaser, <u>and the parties shall have no further obligations except as provided for herein</u>. Purchaser's reason for choosing to terminate this Contract does not need to be related to the condition of the Property, and Purchaser is not required to justify Purchaser's decision to terminate this Contract.

(4)    **Acceptance.** If Purchaser does not properly and timely terminate this Contract before the expiration of the Inspection Period (or if Purchaser accepts the Property in writing) then Purchaser will be deemed to have waived all objections to the Property, except for any title objections that may be outstanding pursuant to <u>Section 6</u> (Review of Survey and Title) of this Contract. In that event, except as may be expressly stated otherwise in this Contract, Purchaser accepts the Property in its current "**AS IS**" condition, with any changes caused by normal wear and tear before the Closing, and this Contract will continue in full force and effect. This provision does not, however, limit or invalidate any express representations and agreements Seller has made in this Contract.

**(5)**    **Restoration.** If the transaction described in this Contract does not close through no fault of Seller, and the condition of the Property was altered due to inspections, studies, tests or examinations performed by Purchaser or on Purchaser's behalf, then Purchaser must restore the Property to its original condition at Purchaser's expense, <u>excluding any pre-existing conditions affecting the Property merely discovered by Purchaser.</u> Purchaser's obligation to restore the Property will survive the termination of this Contract.

B.    **Reports.** Within five (5) days after the Effective Date, Seller shall deliver to Purchaser copies of all reports in Seller's possession or control of engineering investigations, tests and environmental studies that have been made with respect to the Property within the three year period before the Effective Date.

## 11. DELIVERY AND REVIEW OF DOCUMENTS.

A. **Delivery.** Seller agrees to deliver to Purchaser, within <u>five (5)</u> days after the Effective Date, complete and legible copies of the following pertaining to the Property, to the extent in Seller's possession or readily available to Seller:

(1) All current leases, including all modifications, amendments, supplements and extensions thereof (including written descriptions of any oral agreements);

(2) A current rent roll certified by Seller to be true, complete and accurate as of the date of delivery, including names of tenants, annual or monthly rents, expenses paid by tenants and by Seller, commencement dates, terms of leases, and renewal options;

(3) A current inventory of all tangible personal property and fixtures owned by Seller and located on, attached to, or used in connection with the Property, to be sold with the Property, certified by Seller to be true and correct as of the date of delivery;

(4) All service, maintenance, management, or other contracts relating to the ownership and operation of the Property;

(5) All warranties and guaranties;

(6) All fire, hazard, liability, and other insurance policies <u>and loss runs for such insurance policies;</u>

(7) The real estate and personal property tax statements for the previous two calendar years;

(8) All leasing and commission agreements;

(9) The "as built" or other plans and specifications;

(10) A statement of utility charges, repair costs and other expenses incurred by Seller for the operation and maintenance of the Property for each month for the two years preceding the Effective Date;

(11) Any certificate of mold remediation that has been issued for the Property under Section 1958.154 of the Occupations Code within the preceding five years; and

(12) Other: <u>certificates of occupancy.</u>

B.    **Review of Documents.** Purchaser will have a period of time (the "**Document Review Period**") to review the information identified above, ending at the end of the Inspection Period (if any).

Seller's Initials _____    _____    Purchaser's Initials _____    _____

If Purchaser objects to any information disclosed to or discovered by Purchaser, in Purchaser's sole discretion, no matter how arbitrary, Purchaser may: (i) terminate this Contract by delivery of a written notice to Seller before the expiration of the Document Review Period, in which case the Earnest Money will be returned to Purchaser and Purchaser shall return all documents Seller delivered to Purchaser; or (ii) waive the objections and close the transaction. If Purchaser does not deliver a written termination notice to Seller before expiration of the Document Review Period, then any objections as to the information provided by Seller pursuant to this Section will be deemed to be waived by Purchaser.

12. **ESTOPPEL CERTIFICATES.** Seller agrees to deliver to Purchaser, at least <u>ten (10)</u> days before the Closing Date, estoppel certificates executed by each of the tenants under the leases of the Property stating:

      (1)    whether the tenant is an assignee or subtenant;

      (2)    the expiration date of the lease;

      (3)    the number of renewal options under the lease, if any, and the total period of time covered by the renewal options;

      (4)    that none of the terms or provisions of the lease have been changed since the original execution of the lease, except as shown on any attached amendments or modifications;

      (5)    that no default exists under the terms of the lease by either landlord or tenant;

      (6)    that the tenant has no claim against the landlord under the lease and has no defense or right of offset against collection of rent or other charges accruing under the lease;

      (7)    the amount and payment date of the last payment of rent, the period of time covered by that payment, and the amount of any rental payments made in advance;

      (8)    the amount of any security deposits and other deposits, if any; and

      (9)    the identity and address of any guarantor of the lease.

If any estoppel certificate is not timely delivered, or is unacceptable to Purchaser, then Purchaser may immediately notify Seller in writing of Purchaser's objections. Seller shall promptly attempt to cure the unacceptable matters without any obligation to incur any cost in connection with the attempt. If Seller is unable to cure the unacceptable matters before the Closing Date, Purchaser may (i) terminate this Contract by delivering a written termination notice to Seller, in which case the Earnest Money will be returned to Purchaser, <u>(ii) extend the Closing Date for the period of time needed to cure the unacceptable matters</u> or (iii) close the transaction, in which case Purchaser will be deemed to have waived any objections to the unacceptable matters.

13. **CASUALTY LOSS AND CONDEMNATION.**

    A. **Damage or Destruction.** All risk of loss to the Property will remain upon Seller before the Closing. If the Property is damaged or destroyed by fire or other casualty to a Material Extent (defined below), then Purchaser may terminate this contract by delivering a written termination notice to Seller within ten (10) days after the date the casualty occurred (and in any event before the Closing), in which case the Earnest Money will be returned to Purchaser. If the Property is damaged by fire or other casualty to less than a Material Extent, the parties shall proceed to the Closing as provided in this Contract. If the transaction is to proceed to the Closing, despite any damage or destruction, there will be no reduction in the Purchase Price and Seller shall either: (1) fully repair the damage before the Closing, at Seller's expense; or (2) give a credit to Purchaser at the Closing for the entire cost of repairing the Property. The term **"Material Extent"** means damage or destruction where the cost of repair exceeds ten percent (10%) of the Purchase Price. If the repairs cannot be completed before the Closing Date, or the cost of repairing the Property cannot be determined before the Closing Date, then either party may postpone the Closing Date by delivering a written notice to the other party specifying an extended Closing Date that is not more than thirty (30) days after the previously scheduled Closing Date.



B. **Condemnation**. If condemnation proceedings are commenced before the Closing against any portion of the Property, then Seller shall immediately notify Purchaser in writing of the condemnation proceedings, and Purchaser may terminate this Contract by delivering a written notice to Seller within ten (10) days after Purchaser receives the notice (and in any event before the Closing), in which case the Earnest Money will be returned to Purchaser. If this Contract is not terminated, then any condemnation award will (a) if known on the Closing Date, belong to Seller and the Purchase Price will be reduced by the same amount, or (b) if not known on the Closing Date, belong to Purchaser and the Purchase Price will not be reduced.

## 14. ASSIGNMENT.

A.    **Assignment Permitted**.    Purchaser may assign this Contract provided the assignee assumes in writing all obligations and liabilities of Purchaser under this Contract, in which event Purchaser will be relieved of any further liability under this Contract.

## 15. CLOSING.

A. **Closing Date**. The closing of the transaction described in this Contract (the "**Closing**") will be held at the offices of the Title Company at its address stated below, on the date (the "**Closing Date**") that is <u>Fifteen (15)</u> days after the expiration of the Inspection Period.

However, if any objections that were timely made by Purchaser in writing pursuant to <u>Section 6</u> (Review of Survey and Title) have not been cured, then either party may postpone the Closing Date by delivering a written notice to the other party specifying an extended Closing Date that is not more than thirty (30) days after the previously scheduled Closing Date.

B. **Seller's Closing Obligations**. At the Closing, Seller shall deliver to Purchaser, at Seller's expense:

(1) A duly executed Special Warranty Deed conveying the Property in fee simple according to the legal description prepared by the surveyor as shown on the Survey, subject only to the Permitted Exceptions;

(2) An updated Title Commitment committing the underwriter for the Title Company to issue promptly after the Closing, at Seller's expense, the Title Policy pursuant to the Title Commitment, subject only to the Permitted Exceptions, in the full amount of the Purchase Price, dated as of the date of the Closing.

(3) A Bill of Sale conveying the personal property described in this Contract, free and clear of liens, security interests and encumbrances, subject only to the Permitted Exceptions (to the extent applicable);

(4) Possession of the Property, subject to valid existing leases disclosed by Seller to Purchaser and other applicable Permitted Exceptions;

(5) An executed assignment of all leases, if there are any leases affecting the Property;

(6) A current rent roll certified by Seller to be complete and accurate, if there are any leases affecting the Property;

(7) Evidence of Seller's authority and capacity to close this transaction; and

(8) All other documents reasonably required by the Title Company to close this transaction.

C. **Purchaser's Closing Obligations.** At the Closing, Purchaser shall deliver to Seller, at Purchaser's expense:

(1) The cash portion of the Purchase Price (with the Earnest Money being applied to the Purchase Price);

(2) An Assumption Agreement in recordable form agreeing to pay all commissions payable under any lease affecting the Property;

(3) Evidence of Purchaser's authority and capacity to close this transaction;

(4) All other documents reasonably required by the Title Company to close this transaction.

D.     **Conditions Precedent to Obligations of Purchaser and Seller**. The respective obligations of Purchaser and Seller to consummate the transaction are subject to the Bankruptcy Court entering a sale order (the "**Sale Order**"), and the Sale Order shall not be subject to a stay or have been vacated or revoked.

E.     **Closing Costs.** EACH PARTY SHALL PAY ITS SHARE OF THE CLOSING COSTS WHICH ARE CUSTOMARILY PAID BY A SELLER OR PURCHASER IN A TRANSACTION OF THIS CHARACTER IN THE COUNTY WHERE THE PROPERTY IS LOCATED, OR AS OTHERWISE AGREED.

F. **Prorations**. Rents (including any additional rental or reimbursement amounts to be reconciled), lease commissions, interest on any assumed loan, insurance premiums on any transferred insurance policies, maintenance expenses, operating expenses, standby fees, and ad valorem taxes for the year of the Closing will be prorated at the Closing effective as of the date of the Closing (with the Purchaser being considered the owner of the Property for the entire day of the Closing). Seller shall give a credit to Purchaser at the Closing in the aggregate amount of any security deposits deposited by tenants under leases affecting the Property. If the Closing occurs before the tax rate is fixed for the year of the Closing for the preceding year applied to the latest assessed valuation, but any difference between actual and estimated taxes for the year of the Closing actually paid by Purchaser will be adjusted equitably between the parties upon receipt of a written statement of the actual amount of the taxes. This provision will survive the Closing.

G. **Rollback Taxes**. If any Rollback Taxes are due before the Closing due to a change in use of the Property by Seller or a denial of any special use valuation of the Property before the Closing, then Seller shall pay those Rollback Taxes (including any interest and penalties) at or before the Closing. If this sale or a change in use of the Property or denial of any special use valuation of the Property after the Closing would result in the assessment after the Closing of additional taxes and interest applicable to the period of time before the Closing ("**Rollback Taxes**"), then: (1) Purchaser shall pay the Rollback Taxes (including any interest and penalties) if and when they are assessed, without receiving any credit from Seller. If Seller gives a credit to Purchaser for the estimated amount of Rollback Taxes, and the actual Rollback Taxes assessed after the Closing are different from the estimate used at the Closing, then there will be no subsequent adjustment between Seller and Purchaser.

H. **Foreign Person Notification**. If Seller is a Foreign Person, as defined by the Internal Revenue Code, or if Seller fails to deliver to Purchaser a non-foreign affidavit pursuant to §1445 of the Internal Revenue Code, then Purchaser may withhold from the sales proceeds an amount sufficient to comply with applicable tax law and deliver the withheld proceeds to the Internal Revenue Service, together with appropriate tax forms. A non-foreign

affidavit from Seller must include: (1) a statement that Seller is not a foreign person; (2) the U. S. taxpayer identification number of Seller; and (3) any other information required by §1445 of the Internal Revenue Code.

## 16. DEFAULT.

A. **Purchaser's Remedies.**   If Seller defaults or fails to close this Contract for any reason except Purchaser's default or the termination of this Contract pursuant to a right to terminate set forth in this Contract, Purchaser may elect to either:  (1) enforce specific performance of this Contract (require Seller to sell the Property to Purchaser pursuant to this Contract); or (2) terminate this Contract by delivering a written notice to Seller.  If Purchaser elects to terminate this Contract due to Seller's default, then Purchaser will be deemed to have waived the remedy of specific performance and any other remedies available to Purchaser (except for reimbursement for Purchaser's actual expenses as provided in the next paragraph) and the Earnest Money will be returned to Purchaser.

If Seller defaults and Purchaser does not elect to enforce specific performance of this Contract, or the remedy of specific performance is not available, then Seller shall reimburse Purchaser for Purchaser's actual expenses paid by Purchaser to independent third parties in connection with this Contract, including, but not limited to, reasonable fees and expenses for engineering assessments, environmental assessments, architectural plans, surveys and legal work (but excluding any indirect, punitive or consequential damages, such as a claim for lost profits) in an amount not to exceed $50,000.00.

In consideration for Purchaser having expended considerable time and expense in connection with this Contract and the negotiation hereof, in the event a party unrelated and unaffiliated with Purchaser consummates the purchase of the Property, while the Chapter 11 bankruptcy is pending and this Contract has not been terminated by Purchaser, the Seller shall pay Purchaser, in accordance with the terms hereof a break-up fee in an amount equal to five percent (5%) of the Purchase Price (the "**Break-Up Fee**").  The Break Up Fee shall be paid as soon as reasonably practical following the date of consummation of the purchase of the Property.

Purchaser may sue Seller for additional damages (in addition to the reimbursement of expenses as provided in the previous paragraph, to the extent such additional damages can be proven).  If Purchaser chooses to sue Seller for reimbursement of expenses or other damages, then Purchaser must elect to pursue either specific performance or a claim for damages at the beginning of any legal action initiated by Purchaser.

B. **Seller's Remedies.**   If Purchaser fails to close this Contract for any reason except Seller's default or the termination of this Contract pursuant to a right to terminate set forth in this Contract, Purchaser will be in default and Seller may terminate this Contract and receive the Earnest Money as liquidated damages for Purchaser's breach of this Contract, thereby releasing Purchaser from this Contract.  If Seller terminates this Contract due to Purchaser's default, then the Earnest Money will be paid to Seller.

The right to receive the Earnest Money will be Seller's sole and exclusive remedy for Purchaser's default.

## 17. AGENCY DISCLOSURE.

A. **Agency Relationships.** The term "**Brokers**" refers to the Principal Broker and the Cooperating Broker, if applicable, as set forth on the signature page. Each Broker has duties only to the party the Broker represents as identified below. If either Broker is acting as an intermediary, then that Broker will have only the duties of an intermediary, and the intermediary disclosure and consent provisions apply as set forth below.

B. **Other Brokers**.  Seller and Purchaser each represent to the other that they have had no dealings with any person, firm, agent or finder in connection with the negotiation of this Contract or the consummation of the purchase and sale contemplated by this Contract, other than the Brokers named in this Contract, and no real estate broker, agent, attorney, person, firm or entity, other than the Brokers, is entitled to any commission or finder's fee in connection with this transaction as the result of any dealings or acts of the representing party. Each parry agrees to indemnify, defend, and hold the other party harmless from and against any costs, expenses or liability for any compensation, commission, fee, or charges that may be claimed by any agent, finder or other similar party, other than the Brokers, by reason of any dealings or acts of the indemnifying party.

C. **Fee Sharing**.  Seller and Purchaser agree that the Brokers may share the Fee (defined below) among themselves, their sales associates, and any other licensed brokers involved in the sale of the Property.  The parties authorize the Title Company to pay the Fee directly to the Principal Broker, and, if applicable, the Cooperating Broker, in accordance with <u>Section 18</u> (Professional Service Fee) or any other agreement pertaining to the Fee. Payment of the Fee will not alter the fiduciary relationships between the parties and the Brokers.

D. **Intermediary Relationship**. If either of the Brokers has indicated in <u>Section 17.A.</u> (Agency Relationships) that the Broker is acting as an intermediary in this transaction, then Purchaser and Seller hereby consent to the intermediary relationship, authorize such Broker or Brokers to act as an intermediary in this transaction, and acknowledge that the source of any expected compensation to the Brokers will be Seller, and the Brokers may also be paid a fee by Purchaser. **A broker, and any broker or salesperson appointed to communicate with and carry out instructions of one party, who acts as an intermediary is required to act fairly and impartially, and may not:**

> (1) **disclose to the buyer that the seller will accept a price less than the asking price, unless otherwise instructed in a separate writing by the seller;**

> (2) **disclose to the seller that the buyer will pay a price greater than the price submitted in a written offer to the seller, unless otherwise instructed in a separate writing by the buyer;**

> (3) **disclose any confidential information or any information a party specifically instructs the broker or salesperson in writing not to disclose, unless:**

>> (a) **the broker or salesperson is otherwise instructed in a separate writing by the respective party;**
>> (b) **the broker or salesperson is required to disclose the information by the Texas Real Estate License Act or a court order; or**
>> (c) **the information materially relates to the condition of the Property;**

> (4) **treat a party to a transaction dishonestly; or**

> (5) **violate the Texas Real Estate License Act.**

Broker is authorized to appoint, by providing written notice to the parties, a license holder associated with Broker to communicate with and carry out instructions of one party, and another license holder associated with Broker to communicate with and carry out instructions of the other party. An appointed license holder may provide opinions and advice during negotiations to the party to whom the license holder is appointed.



Seller's Initials _____    _____ Purchaser's Initials _____ _____
©Copyright 2015 NTCAR - Form No. 1 (11/2015)                                                     Page 13 of 20

## 18. PROFESSIONAL SERVICE FEE.

A. **Payment of Fee.**   Seller <u>and Purchaser</u> agree to pay the Brokers a professional service fee (the "**Fee**") for procuring the Purchaser and for assisting in the negotiation of this Contract as follows:
<u>Purchaser shall pay Younger Partners Dallas LLC, Attn: Liam Wagner a commission per a separate agreement.</u>
<u>Seller shall pay Younger Partners Dallas LLC, Attn: Tanja McAleavey a commission per a separate agreement.</u>

The Fee will be earned <u>if, as and only when the transaction contemplated hereby closes and funds,</u> and will be paid at the Closing of a sale of the Property by Seller pursuant to this Contract (as may be amended or assigned). The Fee will be paid by Seller to the Brokers in the county in which the Property is located. Seller shall pay any applicable sales taxes on the Fee. The Title Company or other escrow agent is authorized and directed to pay the Fee to the Brokers out of the Closing proceeds. A legal description of the Property, as set forth in this Contract and any Survey delivered pursuant to this Contract, is incorporated by reference in the agreement pertaining to the Fee set forth or referenced in this Section.

B. **Consent Required.**   Purchaser, Seller and Title Company agree that the Brokers are third party beneficiaries of this Contract with respect to the Fee, and that no change may be made by Purchaser, Seller or Title Company as to the time of payment, amount of payment or the conditions for payment of the Fee without the written consent of the Brokers<u>; provided, however, the consent of the Brokers shall not be required for a mutually approved amendment to this Contract adjusting the Purchase Price and/or the Closing Date.</u>

C. **Right to Claim a Lien.**   Pursuant to Chapter 62 of the Texas Property Code, the Brokers hereby disclose <u>and hereby waive</u> their right to claim a lien based on the commission agreement set forth in this Contract and any other commission agreements applicable to the sale contemplated by this Contract. This disclosure is incorporated in any such commission agreements.

## 19. MISCELLANEOUS PROVISIONS.

A. **Definition of Hazardous Materials.**   "**Hazardous Materials**" means any pollutants, toxic substances, oils, hazardous wastes, hazardous materials or hazardous substances as defined in or pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, as amended, the Clean Water Act, as amended, or any other Federal, State or local environmental law, ordinance, rule, or regulation, whether existing as of the Effective Date or subsequently enacted.

B. **Notices.**   All notices and other communications required or permitted under this Contract must be in writing and will be deemed delivered on the earlier of: (1) actual receipt, if delivered in person or by courier, with evidence of delivery; (2) receipt of an electronic facsimile ("**Fax**") transmission with confirmation of delivery to the Fax numbers specified in this Contract, if any; or (3) upon deposit with the United States Postal Service, certified mail, return receipt requested, postage prepaid, <u>or overnight express service,</u> and properly addressed to the intended recipient at the address set forth in this Contract. Any party may change its address for notice purposes by delivering written notice of its new address to all other parties in the manner set forth above. Copies of all written notices should also be delivered to the Brokers and to the Title Company, but failure to notify the Brokers or the Title Company will not cause an otherwise properly delivered notice to be ineffective.

    1. Seller also consents to receive any notices by email.
    2. Purchaser also consents to receive any notices by email.

Seller's Initials _____  _____ Purchaser's Initials _____ _____
©Copyright 2015 NTCAR - Form No. 1 (11/2015)                                   Page 14 of 20

C. **Termination**.  If this Contract is terminated for any reason, the parties will have no further rights or obligations under this Contract, except that: (1) Purchaser shall pay the costs to repair any damage to the Property caused by Purchaser or Purchaser's agents; and (2) each party shall perform any other obligations that, by the explicit provisions of this Contract, expressly survive the termination of this Contract.  The obligations of this Section 19.C. will survive the termination of this Contract. The terms of any mutual termination agreement will supersede and control over the provisions of this Section 19.C. to the extent of any conflict.

D. **Forms**.  In case of a dispute as to the form of any document required under this Contract, the most recent form prepared by the State Bar of Texas will be used, modified as necessary to conform to the terms of this Contract.

E. **Attorneys' Fees**.  The prevailing party in any proceeding brought to enforce this Contract, or brought relating to the transaction contemplated by this Contract, will be entitled to recover from the non-prevailing party, court costs, reasonable attorneys' fees and all other reasonable related expenses.

F. **Integration**.  This Contract contains the complete agreement between the parties with respect to the Property and cannot be varied except by written agreement.  The parties agree that there are no oral agreements, understandings, representations or warranties made by the parties that are not expressly set forth in this Contract. Any prior written agreements, understandings, representations or warranties between the parties will be deemed merged into and superseded by this Contract, unless it is clear from the written document that the intent of the parties is for the previous written agreement, understanding, representation or warranty to survive the execution of this Contract.

G. **Survival**.  Any representation or covenant contained in this Contract not otherwise discharged at the Closing will survive the Closing.

H. **Binding Effect**.  This Contract will inure to the benefit of, and will be binding upon, the parties to this Contract and their respective heirs, legal representatives, successors and assigns.

I. **Time for Performance**.  Time is of the essence under each provision of this Contract. Strict compliance with the times for performance is required.

J. **Business Day**.  If any date of performance under this Contract falls on a Saturday, Sunday or Texas legal holiday, such date of performance will be deferred to the next day that is not a Saturday, Sunday or Texas legal holiday.

K. **Right of Entry**.  After reasonable advance notice and during normal business hours, Purchaser, Purchaser's representatives and the Brokers have the right to enter upon the Property before the Closing for purposes of viewing, inspecting and conducting studies of the Property, so long as they do not unreasonably interfere with the use of the Property by Seller or any tenants, or cause damage to the Property.

L. **Governing Law**.  This Contract will be construed under and governed by the laws of the State of Texas, and unless otherwise provided in this Contract, all obligations of the parties created under this Contract are to be performed in the county where the Property is located.

M. **Severability**.  If any provision of this Contract is held to be invalid, illegal, or unenforceable by a court of competent jurisdiction, the invalid, illegal, or unenforceable provision will not affect any other provisions,

Seller's Initials __Zk__ _____  Purchaser's Initials _____ _____
©Copyright 2015 NTCAR - Form No. 1 (11/2015)                                    Page 15 of 20

and this Contract will be construed as if the invalid, illegal, or unenforceable provision is severed and deleted from this Contract.

N. **Broker Disclaimer**.   The Brokers will disclose to Purchaser any material factual knowledge the Brokers may possess about the condition of the Property.  Purchaser understands that a real estate broker is not an expert in matters of law, tax, financing, surveying, hazardous materials, engineering, construction, safety, zoning, land planning, architecture, or the Americans with Disabilities Act.  Purchaser should seek expert assistance on such matters.  The Brokers do not investigate a property's compliance with building codes, governmental ordinances, statutes and laws that relate to the use or condition of the Property or its construction, or that relate to its acquisition.  Purchaser is not relying upon any representations of the Brokers concerning permitted uses of the Property or with respect to any nonconformance of the Property.  If the Brokers provide names of consultants or sources for advice or assistance, the Brokers do not warrant the services of the advisors or their products. The Brokers cannot warrant the suitability of property to be acquired. Purchaser acknowledges that current and future federal, state and local laws and regulations may require any Hazardous Materials to be removed at the expense of those persons who may have had or continue to have any interest in the Property. The expense of such removal may be substantial. Purchaser agrees to look solely to experts and professionals selected or approved by Purchaser to advise Purchaser with respect to the condition of the Property and will not hold the Brokers responsible for any condition relating to the Property. The Brokers do not warrant that Seller will disclose any or all property defects or other matters pertaining to the Property or its condition.  Seller and Purchaser agree to hold the Brokers harmless from any damages, claims, costs and expenses including, but not limited to reasonable attorneys' fees and court costs, resulting from or related to any person furnishing any false, incorrect or inaccurate information with respect to the Property, Seller's concealing any material information with respect to the condition of the Property, or matters that should be analyzed by experts.  To the extent permitted by applicable law, the Brokers' liability for errors or omissions, negligence, or otherwise, is limited to the return of the Fee, if any, paid to the responsible Broker pursuant to this Contract. The parties agree that they are not relying upon any oral statements that the Brokers may have made. Purchaser is relying solely upon Purchaser's own investigations and the representations of Seller, if any, and Purchaser acknowledges that the Brokers have not made any warranty or representation with respect to the condition of the Property or otherwise.

O. **Counterparts**.  This Contract may be executed in a number of identical counterparts, and all counterparts will be construed together as one agreement.  Any signed counterpart transmitted by Fax or email has the same effect as an original.

P. **Patriot Act Representation**.   Seller and Purchaser each represent to the other that: (1) its property interests are not blocked by Executive Order No. 13224, *66* Fed. Reg. 49079; (2) it is not a person listed on the Specially Designated Nationals and Blocked Persons list of the Office of Foreign Assets Control of the United States Department of the Treasury; and (3) it is not acting for or on behalf of any person on that list.

Q. **Exchange**.  Seller and Purchaser shall cooperate with each other in connection with any tax deferred exchange that either party may be initiating or completing in connection with Section 1031 of the Internal Revenue Code, so long as neither party will be required to pay any expenses related to the other party's exchange and the Closing is not delayed.  Notwithstanding any other provision that may prohibit the assignment of this Contract, either party may assign this Contract to a qualified intermediary or exchange accommodation title holder, if the assignment is required in connection with the exchange.  The parties agree to cooperate with each other, and sign any reasonable documentation that may be required, to effectuate any such exchange.

20. **STATUTORY NOTICES.**

Seller's Initials _____   Purchaser's Initials _____   _____
©Copyright 2015 NTCAR - Form No. 1 (11/2015)                                    Page 16 of 20

A. **Abstract or Title Policy.**   At the time of the execution of this Contract, Purchaser acknowledges that the Brokers have advised and hereby advise Purchaser, by this writing, that Purchaser should have the abstract covering the Property examined by an attorney of Purchaser's own selection or that Purchaser should be furnished with or obtain a policy of title insurance.

B. **Notice Regarding Unimproved Property Located in a Certificated Service Area.**   If the Property is unimproved and is located in a certificated service area of a utility service, then Seller shall give to Purchaser a written notice in compliance with §13.257 of the Texas Water Code, and Purchaser agrees to acknowledge receipt of the notice in writing. The notice must set forth the correct name of utility service provider authorized by law to provide water or sewer service to the Property, and must comply with all other applicable requirements of the Texas Water Code.

C. **Special Assessments Districts.**   If the Property is situated within a utility district or flood control district subject to the provisions of §49.452 of the Texas Water Code, then Seller shall give to Purchaser the required written notice and Purchaser agrees to acknowledge receipt of the notice in writing.   The notice must set forth the current tax rate, the current bonded indebtedness and the authorized indebtedness of the district, and must comply with all other applicable requirements of the Texas Water Code.

D. **Property Owners' Association.**   If the Property is subject to mandatory membership in a property owners' association, Seller shall notify Purchaser of the current annual budget of the property owners' association, and the current authorized fees, dues and/or assessments relating to the Property. In addition, Seller shall give to Purchaser the written notice required under §5.012 of the Texas Property Code, if applicable, and Purchaser agrees to acknowledge receipt of the notice in writing. Also, Seller shall give to Purchaser the resale certificate required under Chapter 207 of the Texas Property Code, if applicable, and Purchaser agrees to acknowledge receipt of the resale certificate in writing.

E. **Notice Regarding Possible Annexation.**   If the Property that is the subject of this Contract is located outside the limits of a municipality, the Property may now or later be included in the extraterritorial jurisdiction of the municipality and may now or later be subject to annexation by the municipality. Each municipality maintains a map that depicts its boundaries and extraterritorial jurisdiction. To determine if the Property is located within a municipality's extraterritorial jurisdiction or is likely to be located within a municipality's extraterritorial jurisdiction, contact all municipalities located in the general proximity of the Property for further information.

F. **Notice Regarding Coastal Area Property.**   If the Property adjoins or shares a common boundary with the tidally influenced submerged lands of the state, then Seller shall give to Purchaser a written notice regarding coastal area property, in compliance with §33.135 of the Texas Natural Resources Code, and Purchaser agrees to acknowledge receipt of the notice in writing.

G. **Gulf Intracoastal Waterway Notice.**   If the Property is located seaward of the Gulf Intracoastal Waterway, then Seller shall give to Purchaser a written notice regarding the seaward location of the Property, in compliance with §61.025 of the Texas Natural Resources Code, and Purchaser agrees to acknowledge receipt of the notice in writing.

H. **Notice for Property Located in an Agricultural Development District.**   If the Property is located in an agricultural development district, then in accordance with §60.063 of the Texas Agricultural Code: (1) Seller shall give to Purchaser a written notice that the Property is located in such a district; (2) Purchaser agrees to acknowledge receipt of the notice in writing; and (3) at the Closing, a separate copy of the notice with current

Seller's Initials ____    ____    Purchaser's Initials ____    ____
©Copyright 2015 NTCAR - Form No. 1 (11/2015)                                                          Page 17 of 20

information about the district will be executed by Seller and Purchaser and recorded in the deed records of the county in which the Property is located.

I. **Certificate of Mold Remediation.** If a certificate of mold remediation has been issued for the Property under Section 1958.154 of the Occupations Code within the preceding five years, Seller is required to provide a copy of the certificate to Purchaser.

J. If the Property adjoins a lake, reservoir, or other impoundment of water that has a storage capacity of at least 5,000 acre-feet at the impoundment's normal operating level, then the following notice applies:

NOTICE OF WATER LEVEL FLUCTUATIONS: The water level of the impoundment of water adjoining the Property fluctuates for various reasons, including as a result of: (1) an entity lawfully exercising its right to use the water stored in the impoundment; or (2) drought or flood conditions.

21. **DISPUTE RESOLUTION.**

A. **Mediation.** If any dispute (the "**Dispute**") arises between any of the parties to this Contract including, but not limited to, payment of the Fee, then any party (including any Broker) may give written notice to the other parties requiring all involved parties to attempt to resolve the Dispute by mediation. Except in those circumstances where a party reasonably believes that an applicable statute of limitations period is about to expire, or a party requires injunctive or equitable relief, the parties are obligated to use this mediation procedure before initiating arbitration or any other action. Within seven (7) days after receipt of the mediation notice, each party must deliver a written designation to all other parties stating the names of one or more individuals with authority to resolve the Dispute on such party's behalf. Within fourteen (14) days after receipt of the mediation notice, the parties shall make a good faith effort to select a qualified mediator to mediate the Dispute. If the parties are unable to timely agree upon a mutually acceptable mediator, any party may request any state or federal judge to appoint a mediator. In consultation with the mediator, the parties shall promptly designate a mutually convenient time and place for the mediation that is no later than thirty (30) days after the date the mediator is selected. In the mediation, each party must be represented by persons with authority and discretion to negotiate a resolution of the Dispute, and may be represented by counsel. The mediation will be governed by applicable provisions of Chapter 154 of the Texas Civil Practice and Remedies Code, and such other rules as the mediator may prescribe. The fees and expenses of the mediator will be shared equally by all parties included in the Dispute.

22. **CONSULT AN ATTORNEY.** This Contract is a legally binding agreement. The Brokers cannot give legal advice. The parties to this Contract acknowledge that they have been advised to have this Contract reviewed by legal counsel before signing this Contract.

Purchaser's attorney is:

Name: _____
Address: _____
_____
_____
Phone: _____
Email: _____

Seller's attorney is:

Bonds Ellis Eppich Schafer Jones LLP
Name: Joshua Eppich
Address: 420 Throckmorton St.,
Suite 1000
Fort Worth, Texas 76102
Phone: 817-405-6905
Email: Joshua@bondsellis.com

Seller's Initials _____ _____ Purchaser's Initials _____ _____

©Copyright 2015 NTCAR - Form No. 1 (11/2015)

23. **EXHIBITS AND ADDENDA.**   All Exhibits and Addenda attached to this Contract are incorporated herein by reference and made a part of this Contract for all purposes:

Exhibit "A"                              Site Plan

24. **CONTRACT AS OFFER.**   The execution of this Contract by the first party to do so constitutes an offer to purchase or sell the Property. If the other party does not accept that offer by signing this Contract and delivering a fully executed copy to the first party by the date that is 10 days after the date this Contract is executed by the first party, then that offer will be deemed to have been automatically withdrawn, in which case the Earnest Money, if any, will be returned to Purchaser.  Any acceptance of an offer that has been withdrawn will be effective only if the party that withdrew the offer subsequently agrees to the acceptance either in writing or by course of conduct.

25. **BANKRUPTCY MATTERS.**   Seller will seek a court order that the sale of the Property is free of all claims, liens, and encumbrances, and that Purchaser is deemed a good faith purchaser under 11 U.S.C. Section 363(m) is a valid cure.

26. **ADDITIONAL PROVISIONS.**

A.     Lease Agreement. At Closing, Seller and Purchaser shall execute a lease agreement for the lease of the Property, based on the following terms: (i) initial term of three (3) years, (ii) base rent of $25,000.00/month (absolute net), increased by 4% annually during the initial term, (iii) one (1) option to extend the term for two (2) years, with base rent based on fair market value during the extended term, and (iv) a deposit equal to six (6) months' gross rent, which shall be reduced by one (1) month of gross rent in months 13 and 25 of the initial term and month 37 if the option to extend is exercised. Seller and Purchaser shall finalize and approve the form of the lease agreement within fifteen (15) days after the Effective Date.

B.     Contract. Seller and Purchaser acknowledge and agree that the parties executed that certain Commercial Contract of Sale dated effective May 9, 2025 (the "Original Contract), and this Contract amends, restates and supersedes the Original Contract.

**Executed to be effective as of the Effective Date.**

BUYER:                                          SELLER:

CanTex RE Holdings, LLC                         Balkan Express LLC

By: (Signature)_____               By: (Signature)_____
                Romit Cheema (Jun 2, 2025 15:07 CDT)            (Jun 2, 2025 15:05 CDT)
Name: Romit Cheema                              Name: Zlatan Karic
Title: President                                Title: Owner


**PRINCIPAL BROKER:**                           **COOPERATING BROKER**


By: (Signature)_____               By: (Signature)_____
Name:_____                          Name:_____
Title:_____                         Title:_____

Address:_____                       Address:_____
_____                               _____

Telephone:_____ Fax:_____                 Telephone:_____ Fax:_____
Email:_____                         Email:_____
TREC License No.:_____                       TREC License No.:_____

TITLE COMPANY RECEIPT: The Title Company acknowledges receipt of this Contract on June 3, 2025
(the Effective Date), and upon receipt of the Earnest Money, accepts the Earnest Money subject to the terms and
conditions set forth in this Contract.

TITLE COMPANY:

CAPITAL TITLE OF TEXAS

By:_____

*PERMISSION TO USE: This form is provided for use by members of the North Texas Commercial Association of Realtors\*, Inc.
("NTCAR") and members of the North Texas Commercial Association of Real Estate Professionals, Inc. Permission is given to make
limited copies of the current version of this form for use in a particular Texas real estate transaction. Please contact the NTCAR office
to confirm you are using the current version of this form. Mass production, or reproduction for resale is not allowed without express
permission. Any changes to this form must be made in a manner that is obvious. If any words are deleted, they must be left in the form
with a line drawn through them.*

# EXHIBIT "A"

## SITE PLAN



Seller's Initials _____ 2k _____ _____

Original ©Copyright 2005 NTCAR - Form No. 1 (3/05)

Purchaser's Initials _____ _____

**Error! Unknown document property name.**

EXHIBIT A

Page 1

# 2560 E Long Ave - Amended and Restated Contract of Sale v5

**Final Audit Report**                                         2025-06-02

| | |
|---|---|
| Created: | 2025-06-02 |
| By: | Chloe Beggins (cbeggins@cantexcapital.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA4quZ7O2Tb-3yQKt8R9V-pX4-G5rB7iIo |

## "2560 E Long Ave - Amended and Restated Contract of Sale v5" History

- Document created by Chloe Beggins (cbeggins@cantexcapital.com)
  2025-06-02 - 5:03:07 PM GMT

- Document emailed to zlatan@balkanexpressllc.com for signature
  2025-06-02 - 5:17:43 PM GMT

- Email viewed by zlatan@balkanexpressllc.com
  2025-06-02 - 8:02:37 PM GMT

- Signer zlatan@balkanexpressllc.com entered name at signing as Zlatan Karic
  2025-06-02 - 8:05:37 PM GMT

- Document e-signed by Zlatan Karic (zlatan@balkanexpressllc.com)
  Signature Date: 2025-06-02 - 8:05:39 PM GMT - Time Source: server

- Document emailed to Romit Cheema (rcheema@cantexcapital.com) for signature
  2025-06-02 - 8:05:45 PM GMT

- Email viewed by Romit Cheema (rcheema@cantexcapital.com)
  2025-06-02 - 8:06:31 PM GMT

- Document e-signed by Romit Cheema (rcheema@cantexcapital.com)
  Signature Date: 2025-06-02 - 8:07:50 PM GMT - Time Source: server

- Agreement completed.
  2025-06-02 - 8:07:50 PM GMT

**Adobe Acrobat Sign**

**Balkan Express, LLC, et al., Debtors**
**Case No. 25-41544-ELM-11**
<u>**COMPLEX SERVICE LIST AS OF**</u>
<u>**6-3-2025**</u>

**Debtors:**

Balkan Express, LLC
Balkan Logistics, LLC
2560 E. Long Ave.
Fort Worth, TX 76137

**20 Largest Unsecured Creditors:**

Chase Bank Card Ink
P.O. Box 15123
Wilmington, DE 19850-5123

Corcentric
Attn: Tammy Albanos
200 Lake Drive East
Suite 200
Cherry Hill, NJ 08002

DAVID GARZA
P.O. Box 297
Panhandle, TX 79068

North Texas Tollway Authority
Attn: Kate Valent
SCHEEF & STONE, L.L.P
2600 Network Blvd., Suite 400
Frisco, TX 75034

Pilot Travel Centers, LLC
Attn:  Luke Russell
5508 Lonas Drive
Knoxville, TN 37909

TERENCE MURPHEY
THE MAJOR LAW FIRM, PLLC
901 NE Loop 410, Suite 680
San Antonio, TX 78209

**Governmental Agencies:**

Attorney General of the United States
Main Justice Bldg, Rm 5111
10th & Constitution Ave NW
Washington, DC 20503-0001

Internal Revenue Service
Insolvency Division
PO Box 7346
Philadelphia, PA 19101-7346

Office of the Attorney General
Bankruptcy-Collections Division
PO Box 12548
Austin, TX 78711-2548

Texas Comptroller of Public Accounts
Bankruptcy & Collection Division MC 008
P.O. Box 12548
Austin, TX 78711-2548

Texas Workforce Commission
TEC Building - Bankruptcy
101 E 15th St
Austin, TX 78778-1442

United States Attorney, N Dist of TX
Attn: Leigha Simonton
1100 Commerce Street 3rd Flr
Dallas, TX 75242

United States Trustee
1100 Commerce Street
Room 976
Dallas, TX 75242

**Secured Creditors:**

BMO
P.O. Box 35704
Billings, MT 59107-5704

Compass Funding Solutions
115 55th St.
Suite 301
Clarendon Hills, IL 60514

Daimler Truck Financial Services USA
14372 Heritage Parkway Ste 400
Fort Worth, TX 76177

De Lage Landen Financial
P.O. Box 825736
Philadelphia, PA 19182-5736

Huntington Technology Finance
5555 Cleveland Ave
Columbus, OH 43230

Hyundai Translead Trailer Finance
655 Business Center Dr.
Ste 250
Horsham, PA 19044

M&T Capital and Leasing Corporation
850 Main Street
Bridgeport, CT 06604

MHC Financial Services, LLC
4501 College Blvd
Suite 160
Leawood, KS 66211

Mitsubishi HC Capital America
P.O. Box 1287
Itasca, IL 60143-0128

Navistar Financial Corporation
2701 Navistar Dr
Lisle, IL 60532

PNC Bank
249 Fifth Ave
Pittsburgh, PA 15222

Sumitomo Mitsui Finance
666 Third Ave
8th Floor
New York, NY 10017

Triumph TBK Bank
12700 Park Central Dr.
Ste 1700
Dallas, TX 75251

Truist Equipment Finance
154 Hillsboro St
Oxford, NC 27565

Volvo Financial Services
P.O. Box 26131
Greensboro, NC 27402-6131

Wallwork Financial Corp
Attn: Justin Pavek
401 38th Street SW
PO Box 628
Fargo, ND 58107-0628

Wells Fargo
P.O. Box 858178
Minneapolis, MN 55485-8178

**Notice of Appearance Parties:**

John D. Gaither
Douglas J. Buncher
Neligan LLP
4851 LBJ Freeway, Suite 700
Dallas, TX 75244

M. Jermaine Watson
Cantey Hanger LLP
600 West 6th Street, Suite 300
Fort Worth, TX 76102

Ross Tower
500 N. Akard St., Suite 2940
Dallas, TX 75201

John Kendrick Turner
Linebarger Goggan Blair & Sampson
3500 Maple Avenue, Suite 800
Dallas, TX 75219

Susan C. Mathews
Baker, Donelson, Bearman, et al
1301 McKinney Street, Suite 3700
Houston, TX 77010

Matthew D. Giadrosich
Padfield & Stout, L.L.P.
100 Throckmorton Street
Suite 700
Fort Worth, TX 76102

Parker, Hudson, Rainer & Dobbs LLP
Attn: Anna K. MacFarlane
303 Peachtree St NE, Suite 3600
Atlanta, GA 30308

Evan S. Goldstein
Updike, Kelly & Spellacy, P.C.
225 Asylum St., 20th Floor
Hartford, CT 06103

James W. Brewer
Kemp Smith LLP
P.O. Drawer 2800
El Paso, TX 79999-2800

James W. King
Offerman & King, L.L.P.
6420 Wellington Place
Beaumont, TX 77706

Christopher L. Halgren
Elizabeth H. Lawrence
McGinnis Lochridge LLP
609 Main Street, Suite 2800
Houston, TX 77002

Michael P. Ridulfo
Kane Russell Coleman Logan PC
5151 San Felipe, Suite 800
Houston, TX 77056

Martin J. Lehman
Palmer Lehman Sandberg, PLLC
8350 N. Central Expressway, Suite 111
Dallas, TX 75206

Buffey E. Klein
Husch Blackwell LLP
1900 N. Pearl Street, Suite 1800
Dallas, TX 75201

Lynn Hamilton Butler
Husch Blackwell LLP
111 Congress Avenue, Suite 1400
Austin, TX 78701